**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION 107, et al.**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al.**

No. 96–5633.

United States District Court, E.D. Pennsylvania.

Aug. 20, 1996.

**600**

Thomas H. Kohn, Sagot, Jennings and Sigmond, Philadelphia, PA, for plaintiffs.

Earl V. Brown, Jr., International Brotherhood of Teamsters, Washington, DC, Steven K. Hoffman, James & Hoffman, P.C., Washington, DC, for defendants.

1. 29 U.S.C. § 464(a) provides in relevant part:
   Any member or subordinate body of a labor organization affected by any violation of this subchapter ... may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate.

2. The Consent Decree resolved a civil action against the IBT under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. The government alleged that the rampant corruption and influence of organized crime infected and dominated the union. As part of the Consent Decree, a three person IRB was estab-

*MEMORANDUM*

BARTLE, District Judge.

This action involves a dispute over a union trusteeship.

Plaintiffs, Local 107 of the International Brotherhood of Teamsters ("Local 107") and certain of its members, allege that the International Brotherhood of Teamsters ("IBT") and its General President Ron Carey ("Carey") have improperly imposed a trusteeship upon Local 107 in violation of § 462 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 et seq. Plaintiffs have moved for a preliminary injunction to enjoin the trusteeship and to compel the IBT to return the governance of Local 107 to its officers.[1] A hearing was held on this motion on August 15, 1996. This court makes the following findings of fact and conclusions, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

On August 6, 1995 the Independent Review Board ("IRB"), established under a 1989 Consent Decree between the IBT and the Government,[2] issued a report criticizing the management of Local 107. The IRB report recommended that Local 107 be placed in trusteeship.

Three days later, on August 9, General President Carey notified Local 107 of his intent to impose an emergency trusteeship over it without a prior hearing pursuant to his authority under Article VI, Section 5(a) of the IBT constitution. Based on the charges set forth in the IRB report, Carey's notice outlined six major reasons for this trusteeship: (1) the decrease in the net assets of Local 107 during the years 1991 to 1995; (2) the continued payment of bonuses to Local

lished. The IRB has broad investigatory and disciplinary powers, together with authority to act on the results of its investigation. Once the IRB has completed an investigation, it must transmit its written report, together with its recommendation, to the IBT, which "must promptly take whatever action is appropriate under the circumstances" and report back to the IRB. The IRB has extensive powers to act if it finds that the IBT has not remedied the problems identified. *See U.S. v. International Bhd. of Teamsters,* 803 F.Supp. 761, 766–68 (S.D.N.Y.1992), *aff'd in relevant part,* 998 F.2d 1101 (2d Cir.1993).

107 employees during financially troubled years; (3) the wrongful personal use of union funds by Local 107 officers along with a general lack of financial control; (4) Local 107's accrual of a mortgage in March, 1995 without proper officer or member approval; (5) the failure to hold monthly membership meetings between October 25, 1991 and August 1995; and (6) the contacts between Local 107 and organized crime.

Carey appointed Gerard P. McNamara, recording secretary of Teamsters Local Union 115, as the temporary Trustee of Local 107. McNamara implemented the emergency trusteeship on August 12, 1996. Two days later, this lawsuit followed, challenging the right of the IBT to mandate a trusteeship on an emergency basis without a hearing.

Section 462 of the LMRDA provides:

Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body....

Plaintiffs claim that the trusteeship imposed on Local 107 was not in accordance with the constitution of the IBT and therefore violated § 462 of the LMRDA. Article VI, Section 5(a) of the IBT constitution details the power of the General President to appoint a trustee and assume control of a local union. It states in relevant part:

If the General President has or receives information which leads him to believe that any of the officers of a Local Union or other subordinate body are dishonest or incompetent, or that such organization is not being conducted in accordance with the Constitution and laws of the International Union or for the benefit of the membership ... or if the General President believes that such action is necessary for the purpose of correcting corruption or financial malpractice ... [or] restoring democratic procedures ... he may appoint a temporary Trustee to take charge and control of the affairs of such Local Union or other subordinate body; provided, however, that before the appointment of such temporary Trustee, the General President shall set a time and place for a hearing for the pur-

pose of determining whether such temporary Trustee shall be appointed; *and further provided that where, in the judgment of the General President, an emergency situation exists within the Local Union or other subordinate body, the temporary Trustee may be appointed prior to such hearing,* but such hearing shall then commence within thirty (30) days and decision made within sixty (60) days after furnishing of the transcript of testimony....

[emphasis added]. This provision, in summary, requires that a hearing *precede* the appointment of a temporary Trustee except in an "emergency situation."

It is undisputed that § 462 of the LMRDA requires that any imposition of a trusteeship accord with the IBT's constitution and bylaws. The Union's constitution, in turn, requires a hearing before that drastic step is taken except in an emergency situation. It is conceded that no prior hearing was conducted. Thus, the pertinent question is whether Carey properly invoked the emergency situation provision of the IBT constitution so as to be able to bypass the hearing requirement and order an immediate trusteeship over Local 107.

The court's role is not to decide whether in fact an emergency situation existed. Under the IBT constitution, this decision lies "in the judgment of the General President." Our role is more limited. According to some courts, we must decide whether the union official acted upon a "good faith belief" that an emergency situation existed. *International Bhd. of Teamsters v. Local Union Number 810,* 19 F.3d 786, 793 (2d Cir.1994). Other courts will uphold the emergency appointment "where the acting official who imposed the trusteeship 'could reasonably believe that an emergency situation does not allow time for [a prior] hearing.'" *Hardy v. International Bhd. of Boilermakers,* 682 F.Supp. 1323, 1328 (E.D.Pa.1988) (quotation omitted).

In order to make this determination under either a good faith or a reasonableness standard, we must first focus on the meaning of the word "emergency" as used in the IBT constitution. We then must apply that defi-

nition to the information known and available to the IBT's General President to determine whether he acted appropriately.

The IBT constitution does not define an "emergency." Nonetheless, in *International Bhd. of Teamsters v. Local 810*, 19 F.3d 786, 793 (2d Cir.1994), the court explained:

Emergency is defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Webster's Collegiate Dictionary (9th ed. 1989). This definition of "emergency" applies to the instant case. In order to comply with the procedural mandates of its constitution, the general president must have had a good faith belief that a situation within the local was developing suddenly and unexpectedly or through an unforeseen combination of circumstances; that the situation was one implicating corruption, financial malpractice or undemocratic procedures; and that the circumstances demanded immediate action.

General President Carey based his decision entirely on the contents of the August 6, 1996 report of the IRB. With one minor exception noted later, that report contained no statements of wrongdoing beyond the end of 1995. It made no charges of continuing wrongdoing up to the present.

The report, for example, emphasized that the Local's finances had deteriorated over a three year period. However, the latest information in the report dealt with the Local's net assets as of December 31, 1995, over seven months before. It contained nothing more current about Local 107's financial condition.

The report also chastised Local 107 for its lack of financial controls, including the failure to review the monthly trustee's report prepared by the Local's accountant. In terms of specifics, the report identified a series of improper or illegal purchases made with union funds by Thomas Ryan, Local 107 President. The amount expended totalled less than $3,500 for theater tickets, food and liquor, airline tickets, a health club membership, items from a nursery, and excessive tips on five occasions. Again, the last purchase noted occurred in December, 1995.

Another example of the Local's lack of financial control listed in the IRB report and relied upon by General President Carey was the taking out of a $210,000 mortgage on the Local's headquarters in March, 1995, over a year before the report, without approval of the Local membership. The money was needed in order to pay some required outstanding contributions to pension and health funds of the Local's employees as well as other bills. In the spring of 1996, however, several months prior to the report, the Local membership approved the mortgage. This was a fact known to the IBT and Carey before August, 1996.

The IRB report also faulted the Local for paying Christmas bonuses to its employees in the nature of a week's salary, for the years 1991 through 1995. Again, the last act complained of occurred in 1995. Of course, no immediacy currently exists here since next Christmas is still over four months away.

The IRB report, in addition, contained a charge of association with organized crime. While such statements are always a matter of grave concern, the connections noted in the report either occurred before Thomas Ryan became president of the Local in 1991, have already been severed, or were tenuous at best. A significant portion of the discussion concerned the criminal ties of former Local 107 president Joseph Cimino. Cimino was dismissed in 1991. A contract for office coffee between Cimino's wife's company and Local 107 admittedly continued thereafter but as noted in the report had been cancelled. The report then returned to Thomas Ryan's dining at The Saloon, which apparently had a reputation as an organized crime hangout. It also expressed concern over a $150 check mailed from Local 107 to Mary's Caterers/The Avenue Cafe in November, 1995 in support of a fund raising drive to provide food for the homeless. The Avenue Cafe is apparently owned by reputed crime underboss Joseph Merlino. Finally, the report discussed how one member of Local 107, Joseph Kelly, was once a co-defendant with reputed organized crime figures, and how another Local 107 member, Michael Clark, visited a prisoner with alleged crime ties in the fall of 1995. It is unclear how these past

associations, somewhat tenuous to begin with, suddenly fostered an emergency in August, 1996.

Another area of criticism was the failure of the Local to hold general membership meetings from October, 1991 through August, 1995, a period which ended a year before the report was written. At that time, a quorum under the Local's bylaws was 300. In September, 1995, a special membership meeting was held where a motion to reduce the quorum to 130 was defeated. In March, 1996, as directed by the IBT, the membership voted to reduce the quorum requirement to 15, the number in the Model Local Union Bylaws. The IBT, however, has still not approved this change which would facilitate the holding of proper membership meetings. Any fault currently lies with the IBT, not the Local.

The IRB report concluded with the following recommendation:

> Based upon the foregoing, it is recommended that Local 107 be placed in trusteeship in order to correct financial malpractice, to ensure that the Local is run in compliance with the IBT Constitution and the Local's Bylaws and for the benefit of the Local's members.

Significantly, at no time did the IRB declare that any emergency existed. Nor did it recommend that a trusteeship be imposed immediately without a hearing.

■ It must be emphasized that the truth of the IRB's charges is not before us. For purposes of this proceeding, the IBT has a right to assume the entire litany of charges to be well founded. We must focus instead on the question of whether Carey acted in good faith or reasonably in determining that an emergency situation existed, given the information contained in the IRB report and any other information of which he was aware at the time he appointed an emergency trustee to control Local 107. We must review this information to determine whether a reasonable person or one acting in good faith could conclude that an emergency situation existed.

■ While the information, if true, is serious, it simply does not constitute an emergency. There is nothing that "was developing suddenly and unexpectedly or through unforeseen combination of circumstances." *International Bhd. of Teamsters*, 19 F.3d at 793. The IRB report was dated August 6, 1996. All the wrongful acts, with one minor exception noted above, took place in 1995 and before. Nothing contained in the report was said to be continuing up to the present. There were no current examples of illegality, extravagance, imprudence, or breach of trust. Even the specific items of "embezzlement" were not of large amounts for a local union of some 3,000 members. Any improper purchases by Thomas Ryan one and two years ago hardly constitute an emergency situation. Much of the criminal conduct was by a person not presently associated with the Local. The only large financial obligation was the mortgage. The Local membership, however, later ratified the decision to obtain it, a fact known to the IBT long before August, 1996. The issue of holding general membership meetings was no longer a problem: the report itself only criticizes the failure to hold such meetings up until August, 1995, a year before the report was submitted. Finally, there was no evidence of present or even recent contact between Local 107 and organized crime.

The appointment of a trustee to supersede the duly elected officers of a local union is an extreme measure. Among other reasons, a trustee may be appointed under the IBT constitution where "such action is necessary for the purpose of correcting corruption or financial malpractice and . . . restoring democratic procedures." IBT Constitution, Article VI, Section 5(a). The IBT constitution, in an effort to provide its Locals with due process, clearly favors an opportunity to be heard even under these circumstances before a trustee is named. Absent some emergency, the Local has a right to present its position that the charges are untrue or otherwise to tell its side of the story before it loses control over its own affairs. *Id.*

■ We in no way seek to diminish or minimize the charges set forth in the IRB report. If true, they constitute not only imprudence and breach of trust, but undoubtedly illegality. We also recognize that we owe deference to the decisions of the General President of the IBT. *Retail Clerks*

*Union Local 770 v. Retail Clerks Int'l Assoc.,* 479 F.2d 54, 56 (9th Cir.1973). Yet, deference does not mean a blank check. Ultimately, the IBT is bound by § 462 of the LMRDA. Simply put, if a union seeks to impose a trusteeship, federal law requires that it obey its constitution.

■ In ruling on a motion for a preliminary injunction, the court must consider:

(1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995).

■ We find and conclude that Local 107 has proved that it is likely to succeed on the merits. It has proved by a preponderance of the evidence that the IBT and its General President did not act in good faith or reasonably in finding the existence of an emergency situation in August, 1996. Thus, he did not act in good faith or reasonably in appointing a trustee to assume control over Local 107 without a prior hearing. Moreover, this emergency trusteeship irreparably harms Local 107 because it denies it the right, guaranteed by the IBT constitution, to a due process hearing in advance of the IBT's imposition of a trusteeship. Defendants suggest that the plaintiffs' right to due process is preserved by their right to an *ex post* hearing to be held within 30 days after the emergency trusteeship commences. We disagree. "It is axiomatic that if no emergency existed, a hearing following the imposition of a trusteeship on a local union cannot legitimize the improperly imposed trusteeship." *Regan v. Williams,* 1986 WL 8413 (W.D.Pa. 1986). While plaintiffs are presently harmed, defendants have not presented any evidence that they would suffer irreparable harm if a preliminary injunction issues in this case. The IBT's position will be protected by affording Local 107 a prompt hearing. Finally, the public interest will be served by a preliminary injunction as the purposes of the LMRDA would be furthered.

We will grant the motion of Local 107 for a preliminary injunction against the IBT and Carey. They will be enjoined preliminarily from exercising a trusteeship over Local 107 and ordered to return control of Local 107 to its duly elected officers. The defendants may proceed with a hearing under Article VI, Section 5(a) of the IBT constitution and may apply to this court to dissolve the preliminary injunction once the issues are determined following said hearing.