LOCAL 450, James Gangale, as President of Local 450 and Daniel Busa, as Vice–President of Local 450, Plaintiffs,

v.

INTERNATIONAL UNION OF ELECTRONIC, ELECTRICAL, SALARIED, MACHINE AND FURNITURE WORKERS, AFL—CIO, Edward Fire, as President thereof, Sal Ingrassia, as President of District 3 thereof, Defendants.

Civil Action No. 97–CV7058(DGT).

United States District Court,
E.D. New York.

Dec. 1, 1998.

Richard A. Levy, Levy, Ratner & Behroozi, P.C., New York City, Victor Rabinowitz, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, for Plaintiff.

Thomas M. Kennedy, Kennedy, Schwartz & Cure, P.C., New York City, Peter Mitchell, General Counsel, International, Union of electronic, Electrical, Salaried, Machine and Furniture Workers, Washington, DC, for Defendants.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

This dispute is about effective unionism in a changing workplace, but it is also about sovereignty, democracy and the right to self-determination within the International Union of Electrical, Salaried, Machine and Furniture Workers, AFL—CIO ("IUE"). Money as well as personal animosity and egotism appear to make peaceable resolution of the underlying conflict all but impossible.

As a result, defendants have moved for an order preliminarily enjoining plaintiffs from "interfering" with the merger of Locals 450

(which is currently comprised of Local 450 and the former Local 445), 470, and 444, or, in the alternative, enjoining plaintiffs from interfering with the supervision of an IUE appointed "administrator" or trustee over Local 450's affairs. In response, plaintiffs have cross-moved for a preliminary injunction enjoining defendants from carrying out their proposed merger, or, in the alternative, from enforcing the trusteeship.

Plaintiffs have also cross-moved for a declaration that Locals 445 and 450 have been properly merged pursuant to a request by the IUE's Executive Board that they do so. Plaintiffs commenced this action after defendant Edward Fire, President of the International, placed Local 445 under the control of an "administrator" who took possession of Local 445's assets and books. Prior to judicial resolution of the merger question, defendant Fire agreed to terminate the administratorship of Local 445. The question of the validity of Local 445's merger into Local 450 has, however, never been resolved. It was stipulated that the former Local 445's assets would be kept separate from those of the merged Local 450, pending a determination of the validity of the Local 445/450 merger.

## Background

Plaintiffs were on the losing side of a hotly contested union election that saw defendant Fire elected President of the IUE and plaintiffs' candidate defeated. Plaintiff Local 450, which once boasted a membership of approximately 10,000 workers at what is now a Lockheed Martin manufacturing and development plant, has dwindled over the years in size to approximately 90 members. Despite the decline in membership, however, plaintiff Local 450 is still in good financial health, possessing a war chest of approximately $400,000 and owning two buildings.

Local 450, which consists of technical and support employees, has a history of animosity with IUE Local 444, the local union representing engineers at the same defense plant. This animosity is the result of past disagreements over collective bargaining agreements and job definitions, which in turn, stemmed from differences between the technical and support workers who are paid on an hourly basis and the salaried engineers. At one point, the engineers even refused to negotiate in the same building as the members of locals representing technical and support staff. Local 444 currently has about 200 members, and its membership supported defendant Fire in the most recent union elections.

On March 11, 1998, defendants announced plans to study the feasibility of merging Local 450 with Local 444 and Local 470, another small local representing technical and support workers at the same plant, and a meeting was held on May 20, 1998 to discuss the merger. At that meeting, twenty-six members of Local 450, including President Gangale and Vice President Busa, testified in opposition to the proposed merger, while members of Locals 444 and 470 submitted letters in support of the merger. On June 29, 1998, fearing that adoption and implementation of the proposed merger plan was imminent, Local 450's officers disseminated a newsletter informing the membership of a meeting to be held nine days later, on July 7, to discuss and vote upon the issue of disaffiliation from the IUE.

Upon learning of the meeting, defendant Fire, President of the IUE, issued an order on July 2, 1998 suspending the officers of Local 450 and placing the local under the control of an "administrator." Notwithstanding the order which purported to suspend Local 450's officers, 60 out of the 90 members of Local 450 met on July 7 and 8, 1998, discussed the issue of disaffiliation, and voted to disaffiliate by a vote of 50 to 10.[1] Disregarding the disaffiliation vote, the Executive Board of the IUE, on July 15, 1998, adopted plans to merge the membership of Local 450 into Local 444, and demanded that all books, assets and property of Local 450 be turned over to the International.

Defendants have moved for an order preliminarily enjoining plaintiffs from interfering with the merger of Locals 450 (including

---

**1.** Six members of Local 450 who worked for Dictaphone and who could not attend the July 7 meeting were permitted to vote and their ballots were counted. All six members voted in favor of disaffiliation.

the membership of Local 445), 470 and 444, and ordering plaintiffs to turn over all funds, books, records, property and assets to administrator Richard Fiore ("Fiore"), or, in the alternative, defendants have sought an order preliminarily enjoining plaintiffs from interfering with Fiore's supervision over Local 450's affairs, including an order to deliver to Fiore all funds, books, records, property and assets of Local 450. Plaintiffs have cross-moved seeking a declaration that the membership of Local 450 is lawfully disaffiliated from the IUE and is entitled to protection against interference by the IUE with the Local, its collective bargaining relationships and its assets, and opposing defendants' request for a preliminary injunction to enforce an emergency trusteeship order and the involuntary merger of Local 450 into IUE Local 444.

### Discussion

#### (1)

■ Federal courts have jurisdiction over suits by local unions alleging violation of the parent international's constitution by the parent organization under section 301(a) of the Labor Management Relations Act ("LMRA"). *See United Ass'n of Journeymen and Apprentices of Plumbing v. Local 334,* 452 U.S. 615, 619, 101 S.Ct. 2546, 2549, 69 L.Ed.2d 280 (1981) ("Section 301(a) establishes federal district court jurisdiction for '[s]uits for violation of contracts ... between any ... labor organizations;'" union constitutions are "contracts" and unions are "labor organizations"). In adopting the LMRA, Congress was apparently "concerned that unions be made legally accountable for agreements into which they entered among themselves." *Id.* at 624, 101 S.Ct. 2546. Nevertheless, as defendants assert in their moving papers, the courts have pursued a "well-established policy of avoiding judicial intervention in internal union matters." *Weiss v. Torpey,* 987 F.Supp. 212, 220 (E.D.N.Y.1997); *see also Fritsch v. District Council No. 9,* 493 F.2d 1061 (2d Cir.1974), *aff'g "thorough opinion" of district court,* 359 F.Supp. 380, 388 (S.D.N.Y.1973) ("A Court should be exceedingly reluctant to substitute

its judgment for that of union officials in the interpretation of the union's constitution, and should interfere only where the official interpretation is unfair or unreasonable."). In *Mason Tenders Local Union 59 v. Laborers' Int'l Union,* 924 F.Supp. 528, 544 (S.D.N.Y. 1996), *aff'd in a summary order,* 101 F.3d 686 (2d Cir.1996) (*"Mason Tenders II"*), the district court noted that

> [c]ourts have routinely followed the rule of deference to union interpretations of their constitutions, and upheld international unions' reorganization and restructuring of their subordinate bodies ... as long as the union's actions are based on a 'plausible' or not 'patently unreasonable' interpretation of its constitution, and as long as the union's actions are not shown to have been taken in bad faith.

*Id.* at 544 (citations omitted).

These cases and others offered by defendants in support of the reasonability of IUE's decisions to compel the merger of, and impose a trusteeship on, Local 450 cannot be relied upon by the IUE defendants. While many union constitutions, including the constitutions in each and every case cited by defendants, permit the parent international union to merge local unions at the discretion of the president (and executive board), that is not the case here. As will be discussed in detail in (4) *infra,* the IUE constitution contains explicit provisions which limit the ability of IUE's president to involuntarily merge its affiliated local unions. Similarly, as will be discussed in detail in (2) *infra,* the trusteeship was invalid because constitutionally required procedures were not followed and conditions precedent to the imposition of a trusteeship were not in existence at the time the trusteeship was imposed. For these reasons, the defendants' actions are based upon interpretations of IUE's constitution that are "implausible" and "patently unreasonable." *Mason Tenders II,* 924 F.Supp. at 544. Accordingly, defendants' motion for a preliminary injunction is denied.[2]

#### (2)

■ Plaintiffs contend that the trusteeship imposed on Local 450 by defendants on July

---

**2.** Thus, it need not be decided whether defendants acted in bad faith.

2, 1998 is in violation of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 461–466 (1998). Section 464(c) of the LMRDA, which is entitled "Presumptions of validity or invalidity of trusteeship," provides that:

> In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title.

29 U.S.C. § 464(c) (1998). As the Second Circuit has noted, the statute "clearly allows a parent union to impose a trusteeship upon a local," but only if: (1) "the parent's constitution provides for it," and (2) "the purpose is one of those enumerated in § 462."[3] *Int'l Bhd. of Teamsters v. Local Union No. 810,* 19 F.3d 786, 790 (2d Cir.1994) (citing *Executive Bd. Local 1302 v. United Bhd. of Carpenters and Joiners of America,* 477 F.2d 612, 613 (2d Cir.1973)) (same). If these conditions are met, the trusteeship is entitled to a presumption of validity for a period of eighteen months from the date of its establishment. *See id.* As the Tenth Circuit noted in *United Bhd. of Carpenters and Joiners*

*v. Brown,* 343 F.2d 872, 883 (10th Cir.1965), "it is quite clear from the statute itself and from the legislative history that Congress intended for the presumption of validity to be available only where the trusteeship has been established ... in conformity with the procedural requirements of its (the labor organization's) constitutions and bylaws." This is because "Congress recognized that trusteeships had, at times, been used as a means of consolidating the power of corrupt union officers, plundering and dissipating the resources of local unions, and preventing growth of competing political elements within the organization." *McDonald v. Oliver,* 525 F.2d 1217, 1228–29 (5th Cir.1976), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976). In addition, section 464(c) expressly authorizes federal courts to grant injunctions to prevent the imposition of illegal trusteeships. *See Teamsters Local 810,* 19 F.3d at 790.

■ In seeking an injunction, the parent union bears the burden of "demonstrat[ing] likelihood of success on the merits of its claim of right to impose the trusteeship." *Id.* If the parent organization succeeds in making such a showing, "the burden shifts to the local to show either that the trusteeship was not imposed in accordance with the procedural requirements of the union constitution or that the parent organization acted without good faith or for a statutorily unauthorized purpose." *Id.* at 790 (citation omitted).

■ Here, the relationship between IUE and Local 450 is governed by the IUE constitution. As the IUE Executive Board ("IEB"

---

**3.** Those purposes include: (i) correcting corruption or financial malpractice, (ii) assuring the performance of collective bargaining agreements, (iii) restoring democratic procedures, or (iv) otherwise carrying out the legitimate objectives of such a labor organization. 29 U.S.C. § 462 (1998). It should be noted that the federal courts have made clear that it is not within the legitimate purposes set forth in LMRDA section 302, 29 U.S.C. § 462, for an international union to impose a trusteeship in order to prevent the disaffiliation of one of its locals. *See Int'l Bhd. of Boilermakers v. Local Lodge 714,* 845 F.2d 687, 694 (7th Cir.1988) ("The few cases that have opined on the question agree that a union's 'legitimate objects' in imposing a trusteeship do not include preventing the secession of its locals, unless one of the other purposes in the statute

... would be thwarted by the secession."); *TMT v. Granite Cutters, Local 106,* 621 F.Supp. 1188, 1193 (E.D.N.Y.1985) (local's impending merger with another local and consequent disaffiliation did not constitute an emergency warranting imposition of a trusteeship without a hearing), *aff'd in a summary order,* 805 F.2d 391 (2d Cir.1986); *see also Benda v. Grand Lodge of Int'l Ass'n Of Machinists,* 584 F.2d 308, 317 & n. 6 (9th Cir. 1978) ("Union self-preservation, standing naked and alone, is not sufficient to justify imposition of a trusteeship."), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Here, the International seeks to justify its actions in seeking to consolidate the local unions pursuant to subdivision (iv) as a desire to improve the bargaining position of the union vis-a-vis Lockheed Martin, their common employer.

or "Executive Board") sought to impose a trusteeship on Local 450 without first holding a hearing, it must be assumed that the IEB was invoking the emergency provision of Article XVII, § A, which states that

> if the President, after consultation and agreement with three members of the Executive Board, determines that a serious emergency exists as a result of a violation of this Constitution, or as a result of a controversy which adversely affects the welfare of its membership in a manner which threatens the subordinate body's existence, or that the closing of a plant which constitutes the sole jurisdiction of the subordinate body is imminent, he or she may suspend the officers of the subordinate body prior to hearing, and place the subordinate body under supervision of an administrator.

Int'l Const., Art. XVII, § A, July, 1997; *see also Int'l Bhd. of Teamsters, Local Union 107 v. Int'l Bhd. of Teamsters,* 935 F.Supp. 599 (E.D.Pa.1996) (local union had right to hearing in absence of emergency). Defendants have, however, not shown that Local 450 is failing to comply with any provision in the IUE constitution, much less that a "serious emergency" exists as a result of plaintiffs' failure to do the same. Nor have defendants established that Local 450 is involved in a controversy which adversely affects the welfare of Local 450's membership in a manner which threatens the Local's existence.

Nearly four months have passed since Local 450 voted to disaffiliate. Local 450 continues to exist as an independent body, seeking recognition of its independent status and freedom from interference in its affairs by the IUE. Local 450 has successfully negotiated a new contract with 9% pay increases over three years for its membership at a Dictaphone plant. There is no indication that the disaffiliation vote at issue in any way endangered the existence of Local 450. Thus, defendants have not shown that an emergen-

cy occurred as a result of the scheduling of a disaffiliation vote by the leadership of Local 450, or that such an emergency in any way affected the welfare of the membership such as to threaten the existence of Local 450.[4]

Defendants, nevertheless, contend that calling a meeting to vote on the issue of disaffiliation creates a serious emergency because such action is in violation of the IUE constitution. That contention is, however, wholly lacking in merit and is directly contradicted by the lack of any express prohibition on disaffiliation in the IUE constitution and by the history surrounding the IUE's founding constitutional conventions. Moreover, the IUE constitution contains no provision impliedly prohibiting disaffiliation. *See* IUE Const. (1997). In the absence of express constitutional language concerning prohibitions on disaffiliation, it would be improper to infer that such proscriptions exist. *See Int'l Bhd. of Boilermakers v. Local Lodge D129,* 910 F.2d 1056 (2d Cir.1990) (citations omitted); *TMT Int'l v. TMT Local 32,* 896 F.2d 1404, 1413 (3d Cir.1990) ("So long as procedures for resignation are absent from the [parent] union's constitution and bylaws ... resignation may be accomplished in any manner sufficient to show a voluntary decision to part with union membership.").

In *Boilermakers D129,* the Second Circuit rejected an international union's claim that a constitutional provision permitting the parent international to impose a trusteeship to prevent "secession or threatened secession" prohibited disaffiliation. *Boilermakers D129,* 910 F.2d at 1061–63. The court found that the international's constitution was "ambiguous" and accordingly, upheld the local's right to disaffiliate. *Id.*

Aside from the lack of any prohibition against disaffiliation in the IUE constitution or any reference to "secession," the history surrounding the IUE's creation fully sup-

---

4. There is also no allegation that any plant constituting the sole jurisdiction of Local 450 has closed or is in danger of closing. Rather, Lockheed Martin is moving to a new facility in Uniondale, Long Island at which the majority of Local 450's membership will work. It may be, as counsel for the IUE claims—and there is some support for counsel's argument—that a number of Local 450 members will soon lose their jobs with Lockheed Martin in light of the company's move to the new facility. However, the fact remains that, at this point, the membership of Local 450 is well above fifty, and Local 450 is still a long way away from having less than fifty members for more than six months. These are preconditions for imposing a trusteeship.

ports plaintiffs' view that IUE Locals have now, and have always had, the right to disaffiliate from the international organization without its approval or consent. The uncontradicted or conceded evidence is that many charter members of the IUE were local unions which had fought bitter and costly legal battles to disaffiliate from the United Electrical Workers Union ("UE"). Gangale Aff., ¶ 8. Weary from their struggles, and wary of surrendering too much of their autonomy to another parent organization, the drafters of the IUE constitution purposefully dispensed with language in the UE constitution which had constrained them·from leaving the union and taking their assets with them. *Id.* While the UE constitution provided that "any disbandment, dissolution, *secession,* or *disaffiliation* of any Local shall be invalid and null and void if seven or more members indicate their desire to retain the Local Charter," the IUE constitution omitted the prohibitions on disaffiliation and secession. UE Const., Art. XVIII, § O (emphasis added); *id.* at ¶ 9.

At the founding convention, on the question of disaffiliation, the Chairman of the IUE constitutional committee differentiated between the prohibitions in the UE constitution and the provisions in the IUE constitution, stating that:

'disbanding, dissolution, secession, or disaffiliation of any Local Union', we are quoting these words which are in the old UE Constitution and you are getting it confused with the Constitution now before us. The Local moves as a body, it takes its contract with it, it takes its treasury with it, it doesn't disband, it is part of that Local Union and has not disbanded and I

think the sooner we get that clarification across in Local 101—Local 101 voted to disaffiliate from the UE and affiliate with the IUE. Now there is no disbanding of a Local Union.

Minutes of IUE Const. Convention, pp. 166–67. The Chairman elaborated that "[t]he words 'secession' and 'disaffiliation' have purposely been left out, so that there is freedom of action in that particular direction." *Id.* This history from the IUE constitutional convention confirms that the omission of a provision relating to disaffiliation was no accident and makes apparent that it was intended that local unions that, at one point, choose to affiliate with the IUE, retain the right to disaffiliate at a later time.

Moreover, the minutes of the founding constitutional conventions make clear that not only may the locals choose to disaffiliate, but they may take their assets and property with them. *Id.* Article XVII, § B of the IUE constitution provides that "[i]n the event that a local's charter is revoked, or that a local disbands or dissolves, the local's secretary and trustees shall send to the Secretary–Treasurer all funds and property belonging to the local." IUE Const. Art. XVII, § B. Regarding this provision, the Chairman of the second IUE convention stated that "[i]t does not cover a Local seeking to disaffiliate, [but rather] it covers the dissolution of a Local that goes out of existence." [5] *Id.* at 12. Thus, despite the International's assertion to the contrary, a local disaffiliating from the IUE retains its status as an independent local union, and is not required to forfeit its assets to the International.[6]

---

**5.** In comparison, the UE constitution had required the forfeiture of assets of a disaffiliating local. The IUE constitution only provides that the property of a local reverts to the International "in the event that a Local's Charter is revoked, or that a Local disbands or dissolves." IUE Const. Art. XVII, § B. "Secession" and "disaffiliation" were intentionally omitted.

**6.** As plaintiffs correctly state in their brief, the cases cited by defendants are distinguishable from this case. In those cases, the constitutional provisions at issue expressly provided for forfeiture in the situations presented. *See, e.g., Int'l Bhd. of Boilermakers v. Local Lodge D504,* 866 F.2d 641, 646–47 (3d Cir.1989) (constitutional provision equating disbanding with less than ten

members remaining), *cert. denied,* 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 27 (1989); *Int'l Bhd. of Boilermakers v. Local Lodge D111,* 858 F.2d 1559, 1563–64 (11th Cir.1988) (same), *cert. denied,* 490 U.S. 1047, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989); *Int'l Bhd. of Boilermakers v. Local Lodge D405,* 699 F.Supp. 749, 755 (D.Ariz.1988) (forfeiture contemplated when less than ten active members remaining); *Int'l Bhd. of Boilermakers v. Local Lodge D296,* 687 F.Supp. 469, 470 (D.Ariz.1988) (forfeiture of assets upon revocation of charter); *TMT Finishers, Shopworkers and Granite Cutters Int'l Union v. TMT Local 32,* 896 F.2d 1404, 1414 (3d Cir.1990) (forfeiture upheld where members of local voted to resign rather than disaffiliate).

Defendants effectively concede that the IUE constitution, as originally drafted in 1949 and 1950, granted the local unions the unfettered right to disaffiliate from the IUE, and defendants do not contend that the IUE constitution in its present form expressly prohibits disaffiliation. Rather, they contend that a series of provisions and amendments adopted over the last fifty years have effectively limited the independence of the local unions to the extent that the right to disaffiliate has been curtailed. This argument too lacks merit.

Defendants cite thirteen provisions as evidence that local union autonomy has been restricted over time to the point where disaffiliation is prohibited. Of the thirteen, five appeared in identical or similar form in the IUE constitution at the time the constitution was adopted in 1949.[7] Three of the eight remaining provisions had very close analogues in the 1949 constitution.[8] Of the five remaining amendments offered by defendants as evidence that the IUE constitution has evolved to prohibit disaffiliation, three do not remotely suggest that such a proscription exists.[9]

Only two amendments might conceivably be on point. One is that under the 1949 constitution, the IUE's Executive Board did not have the authority to merge local unions as it does in limited circumstances today. But the power to merge locals does not imply a prohibition on disaffiliation, and in light of the historical background, detailed above, it would be "patently unreasonable" to infer such a prohibition in what could only then be described as a stealth amendment. *Mason Tenders II*, 924 F.Supp. at 544.

The second is a 1973 amendment to the constitution allowing the IUE Executive Board to disapprove any amendments of locals' constitutions, and disaffiliation would appear to be a constitutional amendment. However, a close examination of the 1973 amendment reveals that amendments to local constitutions have been subject to disapproval by the Executive Board from the inception of the IUE, and IUE locals have always been required to send copies of their proposed constitutional amendments to the Executive Board within thirty days of their adoption. Yet, as the history of the founding constitu-

7. The portion of the current Art. IX, § B, concerning the right of the Secretary–Treasurer to revoke a local's charter when its plant closes, appeared in the 1949 constitution as Art. XVII, § B; Art. XII, § B remains unchanged from 1949; Art. XVI, § L was designated Art. XXIII, § A; Art. XVII, § C was Art. XVII, § E; and Art. XXVIII, § B was Art. XXIV, § A.

8. While another portion of Art. IX, § B today grants the Executive Board the authority, after notice and a hearing, to "amend, suspend, revoke or dissolve" a local's charter or jurisdiction, the Board had such authority in 1949 under Art. XVII, § A. Under the 1949 provision, if the Executive Board, after notice and a hearing, found that a local was failing to comply with the International constitution, it could issue a decision "suspending or revoking the charter of any such local union, or directing such other action as may be necessary to secure compliance with the Constitution." IUE Const. Art. XVII, § A (1949). Similarly, two other provisions cited in this section, Art. XIII, §§ L and N, concern the audit or financial administration of delinquent locals. In 1949, the IUE had considerable authority to deal with a delinquent local, including the power to order an audit, to revoke or suspend the local's charter, or to "take whatever action the Board feels necessary." IUE Const. Art. XIII, §§ L, N (1949). In this case, none of the conditions to invoke the latter two clauses

exist. Nor has the union complied with procedures required to invoke the first (Article IX, § B).

9. (1) The present Art. XIII, § O, which mandates that union funds be held in trust for union membership, prohibits expenditures for the benefit of union officers or employees of both locals and the IUE. On its face, it bears no relation to the disaffiliation right.

(2) Art. XVII, § A allows for appointment of an administrator where the existence of a "subordinate body" is threatened, whereas the IUE constitution originally contained the words "local union." That change appears to be essentially semantic.

(3) Defendants compare the mandatory return provision of the 1949 constitution to the current provision making the return of a revoked charter discretionary. *Compare* IUE Const. Art. XVII, § D (1949), *with* IUE Const. Art. XVII, § B (1997). Under the original provision, the IUE was required to return assets of a local that had gone out of existence to the local's membership if 15 former members reapplied for a membership charter within one year of the date of revocation. The current provision gives the International greater control over the assets and charter of IUE locals. This change can not, however, reasonably be found to have rescinded the right of a local union to disaffiliate.

tional conventions makes clear, the provision adopted at the IUE's founding convention was never intended as a restriction or bar on the right of local unions to disaffiliate.

The only real difference between the original and current provisions is language added in 1973 at the end of former Article XX.[10] That language mandates that the failure to submit an amendment to the IUE within 30 days renders the amendment a nullity until it is submitted and approved. As such, the 1973 amendment was only an enforcement provision to assure that locals do not adopt changes inconsistent with the International constitution. Again, this cannot be read as a limitation on the right of locals to disaffiliate. No local union, either before or subsequent to the adoption of the 1973 amendment, has ever been prevented from disaffiliating on the basis of a failure to comply with these procedural provisions.

Most persuasively, the conclusion that locals have the right to disaffiliate is bolstered by the fact that on all other occasions when IUE Locals have sought to disaffiliate in the past, the IUE has not opposed the disaffiliation. *See* Kennedy Aff., ¶ 11; *and* Kennedy Reply Aff., ¶¶ 2–7. The Kennedy Affidavits note that four Locals (371, 372, 374 and 375) demanded to leave the IUE in the early 1980's, after the adoption of the amendment cited by defendants, and were permitted to disaffiliate. Kennedy Aff., ¶ 11. In addition, there were at least four other instances where locals disaffiliated from the IUE during the 1950's, 1970's, and most recently in 1988 or 1989 (Amalgamated Local 20408). Kennedy Aff., ¶¶ 3–7. Moreover, when these local unions have disaffiliated, they have taken with them their assets, collective bargaining rights, books, records, and other property. *See id.* There is no indication that any of these locals were required first to seek the

permission of the IUE before disaffiliating. The IUE contends, however, that all of these disaffiliations were with its consent. Even if that were the case, disaffiliation under those circumstances would be consistent with plaintiffs' contention that under the IUE constitution, the International has not until now sought to thwart a decision of one of its locals to disaffiliate. Thus, defendants have failed to show that plaintiffs, by voting to disaffiliate from the IUE, have violated any provision of the IUE constitution.

In light of the powerful history of local autonomy within the IUE, defendants' concession that when the IUE constitution was adopted there was no recognized limitation on the right to disaffiliate, and case law protecting a local's right to disaffiliate in the absence of express constitutional language to the contrary, there is no reasonable interpretation of the "living constitution," as it has been described by defendants' counsel, that would justify a prohibition on Local 450's right to disaffiliate. Thus, defendants have failed to establish that the trusteeship imposed upon Local 450 was in conformity with the requirements of the IUE's constitution, and therefore, of § 464(c) of the LMRDA, defendants' conclusory assertions to the contrary notwithstanding. *See* 29 U.S.C. §§ 461–466 (1998). Accordingly, the presumption of validity is not available to defendants and plaintiffs need not show that the IUE acted in bad faith or imposed the trusteeship for a purpose not authorized by the LMRDA. *See Mason Tenders Dist. Council of Greater New York v. Laborers' Int'l Union,* 884 F.Supp. 823, 833 (S.D.N.Y.1995) (*"Mason Tenders I"*); *Brown,* 343 F.2d at 884 ("Since the trusteeship in this case was not established in conformity with the constitution and bylaws, the presumption is not available to appellants.").[11]

10. Article XX originally provided that: 'Constitutions, bylaws, amendments and modifications shall become effective upon adoption by the local if they do not conflict with this Constitution, but shall be subject to disapproval by the Executive Board. All locals shall send copies of their constitution and by-laws and any amendments and modifications thereof to the Union within thirty (30) days after adoption for review by the Executive Board. IUE Const. Art. XX, § A (1949). In 1973, the IUE constitution was amended by making sever-

al minor semantic changes and adding the following sentence: "failure to submit the Constitution and Bylaws and/or amendments within thirty days shall render the Constitution and Bylaws and/or amendments ineffective until such time as they are submitted and approved." IUE Const. Art. XVI, § A (1997).

11. Plaintiffs also argue that the trusteeship violates their rights to free speech under section 302 of the LMRDA, 29 U.S.C. § 462. In light of the holding above, this issue need not be reached.

## (3)

■ Defendants further contend that plaintiffs' amendment of Local 450's constitution to reflect disaffiliation was improperly effectuated. First, defendants argue, that Section 5 of Local 450's constitution states that "[i]f such amendments or changes are not submitted to the Executive Board of the International Union within 30 days after adoption, they shall be automatically invalid until such time as they have been resubmitted and approved." Local 450 Const., Art. XXIV, § 5. Here, no such amendments were forwarded. Second, defendants note that Section 2 of Local 450's constitution provides that "proposed amendments shall be published in the Local Newspaper at least fifteen (15) days prior to the Local membership meeting at which they are to be acted upon." Local 450 Const., Art. XXIV, § 2. Here, only nine days notice was given.

Turning to defendants' first argument, this provision was intended to ensure that the local unions remaining within the IUE would be governed by local constitutions that were consistent with the IUE's constitution. Kennedy Aff., ¶ 12. Local 450's adoption of the amendment appears to have been, in effect, an attempt to bring itself into conformity with the provision adopted by the International in 1973. There is not a shred of evidence that by adoption of this provision, Local 450 intended to limit its disaffiliation rights.

Moreover, Section 5 of Local 450's constitution, significantly, does not mention disaffiliation. Thus, there is no express provision in either the Local or the IUE constitutions that limits the freedom of local union members to disaffiliate. Nor can such a limitation be implied. See Int'l Bhd. of Boilermakers v. Local Lodge D129, 910 F.2d 1056, 1061–63 (2d Cir.1990) (because international's constitution "ambiguous," local's right to disaffiliate upheld). Thus, as the affidavit of Robert Kennedy, member of the Executive Board of the IUE for thirty years, makes clear, Section 5 was not intended to be used as a means of restricting disaffiliation. As the vote to disaffiliate terminated Local 450's contractual relationship with the IUE, Local

450's obligation to report amendments to the IUE ceased to exist.

■ Turning to defendants' second argument, there is no dispute that plaintiffs' officers failed to follow Local 450's own constitutional procedures by giving less than the required 15 days notice before the disaffiliation meeting. The only question remaining is whether such a failure to comply with the requirements of Local 450's constitution rendered the disaffiliation vote invalid.

■ Failure to comply strictly with procedural provisions of a local union constitution does not render union action void so long as the "due process" requirements of the LMRDA are satisfied. Here, plaintiffs provided actual notice of the disaffiliation meeting to the entire membership of Local 450 by mail, by hand and by phone. The Local 450 Newsletter promised a "full discussion" of the disaffiliation issue and a "membership vote." Local 450 Newsletter, dated 6/29/98. Defendants provide no evidence to suggest that these promises were not kept. As a result of the officers' efforts to notify the membership of Local 450 of the scheduled meeting, sixty out of the ninety members of Local 450 attended the meeting and cast votes by secret ballot.

Also on point here is that Section 3 of Article XXIV of Local 450's constitution provides that proposed amendments become part of the local's constitution when "a majority of the members present at a local membership meeting, at which there is at least a 10% quorum, cast their votes for the proposed amendment, provided that such amendment does not conflict with the International Constitution of the Union." Local 450 Const., Art. XXIV, § 3. Thus, normally an amendment to the Local 450 constitution can be adopted by as few as five votes. By way of contrast, here, 66% of the entire membership cast votes on the proposed amendment to disaffiliate, and it was adopted by an absolute majority. Given these clear indications of the efficacy of the notice given in this case, and the fact that the clear will of the majority was reflected in the decision to disaffiliate, it cannot be said that the membership of Local 450 was deprived of its due process rights under the LMRDA by the

giving of nine days notice, rather than fifteen days as required by Local 450's constitution.

### (4)

■ Next, the question of the validity of the imposed merger of Local 450 with Locals 444 and 470 needs to be addressed. It is beyond question that such a merger is insupportable by any plausible or rational interpretation of the IUE constitution. The IUE constitution grants the president authority, subject to the approval of the Executive Board, to merge or amalgamate two or more local unions only when both of the following conditions are met: (1) "the President determines that it is necessary in the best interests of the Union, the Locals involved and the members thereof;" and (2)

> [t]he President, in consultation with the appropriate District President ... find[s] that one or more of the Local Unions involved has had, for any consecutive six month period, an active membership of less than 50 members, and that the financial stability of such Local or Locals is or may be impaired.

IUE Const., Art. XII, § B. The grant of authority from the first clause of the section is expressly restricted by the language in the second clause of the same provision. Accordingly, the president of the IUE has the authority to involuntarily merge local unions only where two conditions are met: (1) the local to be merged has less than 50 members, *and* (2) its financial stability is or may be "impaired." Defendants do not contend that Local 450 now, or at the time of the purported merger, had less than 50 members, much less that Local 450 had less than 50 members for a consecutive six month period. Nor have defendants alleged that the financial stability of Local 450 is in any way "impaired." To the contrary, Local 450 currently possesses assets in the amount of approximately $400,000 and owns two pieces of real property. Thus, defendants have failed to advance a plausible interpretation of the IUE constitution to justify an imposed merger of Local 450 with Locals 444 and 470.

Defendants do, however, advance an implausible interpretation of the IUE constitution which, in effect, would sever the first and second parts of section B, and interpret each clause as an independent grant of authority to merge local unions. Defendants read the first sentence of section B as granting defendant Fire the authority to merge locals at his discretion, while the second sentence, defendants argue, *requires* that locals be merged when a local's membership has remained below 50 for six months and the local is financially impaired.[12] This interpretation of the merger provision is tortured, at best.

In 1972, a proposal which would have given the Executive Board of the IUE the authority now claimed was rejected by the membership. Bywater Aff., ¶ 4. That proposal provided that "[t]he Executive Board may, after notice and opportunity for hearing, merge two or more locals, or, amend, suspend, revoke or dissolve the charter or jurisdiction of any local union." Gangale Reply Aff., ¶ 12. The minutes evidencing the discussion surrounding the defeat of the 1972 proposed amendment show that the membership largely viewed the proposal as "coercive," "monopolistic" and a threat to the "autonomy and pride" of local unions. Minutes of IUE Convention, pp. 93–96 (1972).

Moreover, the current merger provision is derived from language first adopted in 1986, with the sole difference between the 1986 provision and the current language being that the 1986 provision required a local membership of less than twenty-five before merger could be imposed by the Executive Board, while the current provision allows for forced merger when there is a membership of less than fifty. Former president of the IUE, William Bywater, who presided over the IUE constitutional convention in 1986 where the present merger provision was adopted, stated in his affidavit that defendants' interpretation of the current merger provision is "completely inconsistent with its intended purpose." Bywater Aff., ¶ 3. Regarding the

---

**12.** Despite defendants' claim that the first sentence of the merger provision provides an independent grant of authority to merge locals, IUE

President Fire acknowledged in his deposition that the IUE had never undertaken a forced merger prior to the present effort.

1986 provision, then Vice President Dicicco of the IUE stated:

> In order to effectuate a merger of two smaller locals, they have to meet the two tests that are spelled out. Number one, they must be less than 25 members. And secondly, they have to have financial instability. They have to be financially instable (sic), because there are certainly some smaller locals who are paying sufficient dues that allow them to participate, and it is not the intention of this amendment or this particular section to infringe on that.

Minutes of IUE Convention, p. 150 (1986). Thus, there can be no question that this provision was intended to permit merger only in cases where the requirements of both conditions of section B are met.

In sum, even if Local 450 could not and did not validly disaffiliate, the compelled merger was not authorized by the IUE constitution, and, therefore, was illegal.

### (5)

■ Plaintiffs also contend that the Executive Board violated the LMRDA when it purported to impose a trusteeship on Local 445 following the voluntary merger of Locals 445 and 450. Here, as above, there was no "serious emergency" to justify imposing a trusteeship nor was there any rational explanation for defendants' refusal to recognize the voluntary merger of Locals 445 and 450, given that the merger had been requested by IUE leadership, approved by its Executive Board, and fully implemented by the officials of the Locals. Gangale Aff., ¶ 35; Minutes of Proceedings of IEB, dated 3/12/96; President's Report to the IEB, dated 6/18/96 (stating that "Local 445 has been merged into Local 450"). The only common sense explanation for defendants' revocation of its initial recognition of the merger is that defendants, having subsequent to the merger of the locals adopted a resolution that allowed the IUE to forfeit the assets of a merged local to the International, sought for themselves the assets of both local unions.[13] Moreover, given that defendants acted after the merger of Locals 445 and 450 had taken place, it would seem apparent that the IUE could no longer impose a trusteeship upon, or otherwise interfere with, the former membership of Local 445.

However, there is some question as to whether proper procedures were followed by the leadership of Locals 445 and 450 in effectuating the merger. Apparently, only the leadership of both unions, and not the membership, voted on the merger. However, the membership of Local 445 appears to have been fully informed of the voluntary merger at the time that the merger was effectuated, and there is no indication that even a single member of Local 445 voiced any opposition to the merger with Local 450. Nor has any member of former Local 445 come forward to challenge that merger here. Instead, twenty members of former Local 445 question the

---

**13.** While the International contends that the involuntary merger was proposed with the best interests of Local 450 in mind, the history surrounding the events in question is strong evidence that what the merger is about is also forfeiting and seizing Local 450's money and property. *See* Minutes of Mtg. of IUE Bd. of Directors., dated April 21, 1997, pp. 163–177, 289–300. That this was at least one of IUE's main objectives is evidenced in these excerpts of discussions contained in the April 1997 transcript:

> MR. MILLER: ... [a] lot of smaller locals are sitting on substantial amounts of money ... the Labor Department has the lawyers list on two disks that has all the assets and revenues of every local in the whole country ... We know what every local in District 11 has for assets and yearly revenues. The staff person would then know up front whether there was money that that local could start to disburse before we went in.

> ***
> PRESIDENT FIRE: ... I know in your own district [district three], Sal [Sal Ingrassia], you've got some very small Locals with a hell of a big treasury, worth a whole ton of money. You just can't walk in there and say we're taking over, you know, that kind of stuff.
> VICE PRESIDENT INGRASSIA: Oh, you can do that, but you'd better have a gun.

Minutes of Mtg. of IUE Bd. of Directors., dated April 21, 1997, pp. 166, 172. Moreover, defendants' Memorandum of Law is telling. Defendants state that "the combined treasuries of Locals 450 and 445 exceed $400,000.... These assets should benefit all the hundreds of thousands of members of the International, not just the handful who remain in Locals 450 and 445 and who stand to reap a windfall if the International Constitution is not enforced." Def. Mem. in Supp. of Mot. for Preliminary Injunction ("Def.Mem.I"), p. 5.

decision to disaffiliate, a decision in which these members had a voice and an opportunity to vote on July 7. They cannot now complain that they do not like the result of that vote.

There is also a disagreement over whether the merger was completely effectuated. It would appear, however, that in all respects, the Locals were operating as a single organization by May 8, 1997 at the time when IUE hired investigators to perform an audit of the locals' business operations and finances. At that time, the auditors concluded that "[a]s far as the two locals are concerned, they have merged." Merger Study of IUE Locals 445 and 450, dated 5/8/97. By the time the study was performed, Lockheed Martin had started issuing a single dues check-off payment to the locals and had merged its union activity roster (i.e., its record of the time spent by officers on union activities). *Id.* The locals had combined all of their bank accounts, and books, and Local 445 had moved into Local 450's building (and stopped paying rent to Local 450). *Id.* Moreover, arbitration hearings ceased to be held on behalf of Local 445. *Id.* Following the conclusion of their investigation, the auditors found that "[r]ight now [Locals 445 and 450] are existing as one entity." *Id.*

Thus, for the reasons discussed above, it is likely that Local 450 will prevail on its claim that the merger of Locals 445 and 450 was validly effectuated.

### (6)

■ As defendants correctly state in their brief, a party seeking a preliminary injunction must establish: "1) irreparable harm should injunctive relief not be granted and 2) either a likelihood of success on the merits, or sufficiently serious factual questions making a fair ground for litigation with a balance of hardships tipping in the movant's favor." *Local 810*, 19 F.3d, at 789 (citations omitted). Here, defendants' actions in seeking to block the disaffiliation of

Local 450, impose a trusteeship, and merge it with Locals 444 and 470 are all unjustified and unjustifiable by any "reasonable" or "plausible" interpretation of the IUE constitution. *Mason Tenders II*, 924 F.Supp. at 544. Thus, defendants have neither established any likelihood of success on the merits nor a fair basis upon which relief to defendants may properly be granted.

Turning now to plaintiffs' request for injunctive relief, plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of defendants' actions unless a preliminary injunction is issued to them. As plaintiffs correctly contend, the LMRDA was enacted to preserve and protect, among other things, a local union's fundamental right of self-determination. *See Mason Tenders I*, 884 F.Supp. at 833. Courts have recognized that deprivation of this "substantial" right "cannot be meaningfully recompensed," because it constitutes irreparable injury. *Smith v. Distillery, Rectifying, Wine & Allied Workers Int'l Union*, 1970 WL 638 at *5 (E.D.Ky.1970); *Mason Tenders I*, 884 F.Supp. at 833 (trusteeship abridged District Council's right to self-determination, causing irreparable injury); *see also Regan v. Williams*, 1986 WL 8413 at *3 (W.D.Pa.1986) (right to self-determination is "substantial" right, "deprivation of which cannot be meaningfully recompensed," and denial of which would cause "irreparable harm").

Here, plaintiffs' rights to self-determination have been abridged by the attempted imposition of the trusteeship. The trusteeship would infringe upon plaintiffs' rights to vote and decide local union matters, to manage and control local union assets, and to negotiate and bargain in the manner chosen by the local membership. Moreover, the harm to plaintiffs would be even greater if the trusteeship were used to merge plaintiff Local 450 out of existence.[14]

---

14. Plaintiffs also contend that "since the members of Local 450 never voted for Local 444 to represent them and since there will be no continuity in the leadership of the new representative, the employers will be within their rights to refuse to recognize Local 444 as representative of the former Local 450 members. In that event, the collective bargaining rights of the Local 450 members will be extinguished. Such harm cannot be repaired." Pl. Mem. in Supp. of Cross–Motion for Preliminary Injunction ("Pl.Mem.I"), p. 26. This argument need not be addressed in light of the other evidence of irreparable injury offered by plaintiffs.

Finally, plaintiffs correctly contend that the trusteeship would irreparably harm them by depriving them of the right, guaranteed by the IUE constitution, to a due process hearing in advance of the IEB's imposition of a trusteeship. *See Local Bhd. of Teamsters, Local Union 107 v. Int'l Bhd. of Teamsters,* 935 F.Supp. 599, 604 (E.D.Pa.1996) (in absence of emergency, deprivation of due process hearing in advance of imposition of trusteeship constituted irreparable harm). Thus, plaintiffs have established that, in the absence of injunctive relief, they will suffer irreparable harm.

As to the question of likelihood of success on the merits, it is apparent from the discussion to this point that plaintiffs stand the greatest likelihood of success on the merits. Accordingly, because plaintiffs are able to establish probability of success on the merits, there is no need to address the balance of hardships. *See Local 810,* 19 F.3d, at 789 (party seeking preliminary injunction must establish either likelihood of success on the merits, *or* serious factual questions with balance of hardships tipping in movant's favor). However, even were "the balance of hardships" at issue, such a balance would be found to favor the plaintiffs.

Plaintiffs correctly contend that plaintiff Local 450's "loss of autonomy" and "the right to self-determination," among other considerations, tip the balance of hardships in plaintiffs' favor. Pl. Mem. I, pp. 26–27. Defendants counter that unless an injunction is granted: (i) "[t]he ability of the International Union to effectively implement the policy choices it makes for and on behalf of the membership;" (ii) "the potential degradation to the bargaining position of the International both at this facility and nationally;" and (iii) "the International's ability to resolve whatever issues arise as a result of the relocation," will be irreparably harmed. Def. Mem. I, p. 19. Defendants' arguments, however, ring hollow when considered in conjunction with defendants' predictions of dwindling membership at Local 450 in the near future. It is difficult to see how the International's

loss of the ability to bargain and implement policy choices on behalf of a theoretical handful of local union members [15] would cause defendants irreparable harm of a magnitude sufficient to tip the balance of harms in their favor. In addition, defendants, belying what may well be the unspoken impetus for the proposed merger, assert that the International will also suffer irreparable harm if it is not permitted to "immediately assume effective control of the assets of Local 450 and Local 445." *Id.* As previously discussed, the International has no legitimate claim to those assets. Accordingly, even were the balance of hardships at issue, that balance would favor the plaintiffs.

Thus, as plaintiffs have established both elements required for a grant of preliminary injunctive relief, such relief may properly be granted.

## Conclusion

Plaintiff Local 450 has established that, upon resolution of the merits of this action, it is likely that Local 450 will be found to have disaffiliated from the IUE. With respect to the trusteeship imposed on Local 450, it is likely that it will be found to have been invalidly imposed. It is also likely that the involuntary merger will be found to have been invalid. Accordingly, plaintiffs' cross-motion for an order preliminarily enjoining defendants from interfering or attempting to interfere with the elected leadership of Local 450 in their administration and governance of the Local, and restraining defendants from otherwise interfering or attempting to interfere with the administration and control of the books, records, property and other assets of Local 450 is granted.

With respect to the trusteeship imposed on Local 445, since the parties have arrived at a stand-still agreement, there is no reason to grant injunctive relief. Control over the books, records, property and other assets of former Local 445 will be maintained pursuant to the stand-still agreement by Local 450 until resolution of the action.

---

**15.** Or, as defendants refer to Local 450's membership in their brief, "these few individuals."

*Id.*

Defendants' motion for a preliminary injunction is denied for the reasons stated.