The **EXECUTIVE BOARD OF TRANSPORT WORKERS UNION OF PHILADELPHIA, LOCAL 234; Thomas Casey; Joseph Coccio; Brian Pollitt; Karl Turner; Robert O'Connor; Abe Tisdale; Willie Beckton; Charles Clancy; Robert D'Alfonso; Members of Transport Workers Union of Philadelphia, Local 234, Plaintiffs,**

v.

**TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO; Nellie (Jean) Alexander, individually and as President of Transport Workers Union, Local 234, Defendants.**

Civil Action No. 02–6633.

United States District Court,
E.D. Pennsylvania.

Dec. 19, 2002.

**482**

Bruce Bodner, Kaufman Coren & Ress PC, Philadelphia, PA, Jay H. Dahlke, Brodie & Rubinsky, Philadelphia, PA, for Plaintiffs.

Gail Lopez-Henriquez, Freedman & Lorry PC, Philadelphia, PA, Joseph J. Vitale, Cohen Weiss & Simon LLP, New York, NY, for Defendant TWU.

Jay H. Dahlke, Michael Brodie, Brodie & Rubinsky, Philadelphia, PA, for Defendant Alexander.

## OPINION

BAYLSON, District Judge.

"The very essence of democratic government consists in the absolute sovereignty of the majority...."[1] When Alexis de Tocqueville wrote these words in the middle of the nineteenth century, there were, of course, no labor unions. De Tocqueville was relating his perceptive observations of American society in general, and the methodology by which Americans selected their government in particular. But the thoughts which he expressed convey an important principle for the issue at stake in this case, that the winner of a democratically held election controls the body politic; indeed, the elected majority makes the decisions, subject only to the constraints of an overriding constitution. This is the foundation under which our Congress operates, under which our state legislatures operate, and for the reasons stated in this opinion, under which this Court finds that Transport Workers Union ("TWU") Local 234 ("Local 234") must operate: to adhere to "the absolute sovereignty of the majority."

### I. Background

Internal disputes of Local 234 are not a stranger to this Court. The most recent decision, *Transport Workers Union of Philadelphia, Local 234 v. Transport Workers Union of America, AFL–CIO*, 131 F.Supp.2d 659, 661 (E.D.Pa.2001) (Bechtle, J.), imposed a trusteeship on this local after TWU levied charges against Local 234 Executive Board members for financial malpractice, subversion of union democracy, and discord among the Board members. *Id.* at 661. One of Judge Bechtle's reasons for doing so was that "a preliminary injunction enforcing the trusteeship is necessary to restore democratic procedures." *Id.* at 667. The trusteeship remained in effect from early 2001 until the election of new officers took place in July 2002. *Executive Board of Local 234 v. Transport Workers Union of America, AFL–CIO*, C.A. No. 02–6633, 2002 WL 1900799, at *1, 2002 U.S. Dist. LEXIS 15471, at *4 (E.D.Pa. Aug. 9, 2002).

On July 19, 2002, an election was held for Local 234 officers and its Executive

---

1. ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA Ch. XV (1835).

Board ("Board"). (Pl.'s Compl. ¶ 9).[2] As a result of the election, fourteen Local 234 members were elected to positions on the Board. *Id.* ¶ 10. These fourteen members ran on two opposing electoral slates, including nine members, the individual Plaintiffs, who ran as part of the "Jeffrey Brooks Unity Team," and five members who ran on the "Alexander slate," named after Local President and Defendant, Jean (Nellie) Alexander ("Alexander"). *Id.* ¶ 11. The election resulted in a "split Board" for the first time in Local 234's history. *Id.* Previously, competing electoral slates had always won all seats on the Board. *Id.*

On July 25, 2002, the Board convened its first meeting with all members present, and Alexander presiding. *Id.* ¶ 23. After discussion and debate, the Board passed the following three motions: (1) to hire a professional accountant to inspect and audit the books and records of the Local's finances; (2) to retain a law firm as legal counsel to the Local; and (3) to hire five union members as full time staff in accordance with the Local's collective bargaining agreement with SEPTA. *Id.;* Pl.'s Ex. 3. The Board also voted temporarily to refrain from hiring any business agents pending the completion of a review of the Local's finances. (Pl.'s Compl. ¶ 23). All of these motions passed by a vote of nine to five, with Alexander and her fellow slate members voting against all the motions. *Id.* ¶ 24.

That same day, Alexander sent a letter to TWU President Sonny Hall challenging the constitutionality of the motions passed by the Board and requesting a presidential interpretation of the scope of her powers as the Local 234 President under the TWU Constitution. *Id.* ¶ 25; Pl.'s Ex. 4. She claimed that she had "the power, to the

exclusion of the Executive Board, to designate the Local's attorneys, accountants and appointed Business Agents" based on "the implied powers given to the President" by Article XVI § 1 of the TWU Constitution, (Pl.'s Compl. ¶ 25; Pl.'s Ex. 4), which provides:

> The President shall preside at all meetings of the Local Union, the Local Executive Board and Joint Executive Committee. He/she shall sign all orders of the Financial Secretary–Treasurer authorized by the Local Executive Board and shall countersign all checks issued by the Financial Secretary–Treasurer against the accounts of the Local Union on authorization of the Local Executive Board. He/she shall enforce the provisions of this Constitution. He/she shall appoint all committees not otherwise provided for. He/she shall perform such other duties as the Local Union, or the Local Executive Board may assign to him/her; and except as to powers and duties specifically conferred on him/her by the Constitution, he/she shall adhere to all decisions and directions of, and be subject to, the Local Executive Board. He/she shall be, ex officio, a delegate to Convention of the International Union and of all organizations to which the Local is affiliated. He/she shall be responsible for the proper conduct of the affairs of the Local union, and the compliance by his/her fellow officers with their obligations under the International Constitution and the Local by-laws. He/she shall be chairman of the Local's Committee on Political Education.

(Pl.'s Ex. 1).

Alexander also published a letter in an edition of *TWU Local 234 and You On the*

---

**2.** All citations to the Complaint reflect facts either not in dispute or proven by the evidence at the hearing.

*Move,* the Local's official publication, in which she attacked the Board for the motions it passed on July 25 and threatened to file disciplinary charges against the Board members who voted for the motions. (Pl.'s Compl. ¶ 27; Pl.'s Ex. 13).

On the very next day, July 26, 2002, President Hall rendered an interpretation of the TWU Constitution which upheld the local president's responsibility "for the proper conduct of the affairs of the Local Union." (Pl.'s Compl. ¶ 31; Pl.'s Ex. 5). He wrote that that responsibility was "inextricably bound up" with a local president's exclusive power to hire and fire staff members:

> Article XVI, Section 1., places on the Local President the responsibility "for the proper conduct of the affairs of the Local Union." It is inconceivable to me that a Local President could even begin to carry out this responsibility without the power to select staff and professionals whom the President felt he/she could trust to provide the necessary assistance in a reliable manner. The responsibility for "the proper conduct of the affairs of the Local Union" is thus inextricably bound up with the power to hire and fire staff professionals. The Executive Board of the Local cannot usurp the power in question without invading a responsibility specifically assigned by the Constitution to the Local President. Any attempt by an Executive Board, on its own and contrary to the wishes to the President, to exercise the power to hire and fire thus violates the T.W.U. Constitution.

(Pl.'s Ex. 5).

Following the filing of the Complaint in this action, Plaintiffs appealed President Hall's interpretation to the International Executive Council ("IEC"), as permitted by the TWU Constitution, Article V § 1. (Pl.'s Ex. 1). On October 30, 2002, the IEC issued a decision affirming President Hall's interpretation, but clarified that the Board could review decisions made by the Local President and may disapprove certain decisions based on an undefined "reasonableness standard." (Pl.'s Ex. 6). This letter reflects Defendants' position against the Plaintiffs' Motion for Preliminary Injunction and states in pertinent part as follows:

> Your appeal from the interpretation of the T.W.U. Constitution by President Hall (dated July 26, 2002) was placed before the International Executive Council on October 22, 2002. Prior to consideration of the matter by the entire Council, President Hall told the Council that his interpretation should not be taken to stand for more than what it explicitly stated, namely, that the decisions to hire and fire staff, and to retain outside professional help, must originate with the President, and that the Executive Board had no right to usurp this Presidential authority by initiating decisions on who to hire and who to retain without reference to the decisions made by the President. He said that this interpretation should not be taken to mean that the Executive Board had no role whatever in reviewing these kinds of decisions by the President, or that in appropriate cases the Executive Board could not be justified in voting to disapprove, for instance, a particular arrangement reached between the President and an outside lawyer or accountant, provided its justification for the rejection was reasonable.

*Id.*

The letter continues, that a motion to affirm the constitutional interpretation made by President Hill in his letter of July 26 was passed.

The Complaint in this case, filed on August 6, 2002, was accompanied by a Motion

for Preliminary Injunction. At a scheduling conference with counsel, all parties agreed that an internal union appeal was still pending, and the Court was requested to withhold scheduling a hearing until the internal union appeal mechanism had been exhausted. As noted above, that appeal was decided on October 30, 2002, and shortly thereafter, the Plaintiffs filed a renewed Motion and supplemental memorandum which was answered by the Defendants.

An evidentiary hearing was held on December 11, 2002. At the hearing, the Plaintiffs presented testimony from Thomas R. Casey, the duly elected Recording Secretary of Local 234, and a number of documents. The Defendants introduced exhibits but did not present any testimony.

Plaintiffs have agreed that their Motion will be limited to Count I of the Complaint, which alleges that President Hall's interpretation of Article XVI § 1 of the TWU Constitution, giving the Local President the power to hire and fire legal counsel, professional consultants, and other staff without approval from the Board, violates the TWU Constitution and Local 234 By-laws.[3] Plaintiffs assert that President Hall's interpretation directly contradicts provisions of the TWU Constitution establishing Executive Board supremacy in the administration of daily affairs of Local 234, is patently unreasonable, not entitled to judicial deference, and that TWU has violated section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 et seq. (Pl.'s Compl. ¶¶ 47–48).

Plaintiffs request that TWU be enjoined from giving force or effect to President Hall's July 26, 2002 constitutional interpretation of presidential powers and otherwise interfering with the internal affairs of Local 234; that TWU and Alexander give full force and effect to the motions passed at the Executive Board's July 25, 2002 meeting; and that Alexander be enjoined from filing disciplinary charges against Plaintiffs. (Pl.'s Mot. for Preliminary Injunctive Relief).

As noted above, Recording Secretary Casey testified at the Preliminary Injunction hearing. The Court found him credible in all respects. Mr. Casey detailed the debilitating effect that the bickering between the local factions has had on union affairs. The Local President, Defendant Alexander, has generally refused to honor the Executive Board's request for meetings, and there is a general shutdown of most union business. Although the parties did agree to what was referred to as a "cease-fire" reflected in a letter dated August 15, 2002, (Pl.'s Ex. 25), the internal operations of the union have been stymied by the dispute, with the Local President having the general backing of the international union's internal power to interpret the constitution, which it has done so as to deny the Local Executive Board any control over the operation of the local union.

## II. *Legal Standard and Jurisdiction*

 In ruling on a motion for a preliminary injunction, the Court must consider the following four factors: (1) the likelihood that the moving party will prevail on the merits; (2) the extent to which the moving party is irreparably harmed; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.

---

**3.** Although Count I of the Complaint also alleges the Defendants' actions constitute a breach of a binding contractual agreement between the International Union, Plaintiffs, and members of Local 234, (Pl.'s Compl. ¶ 47), this contention was not pursued at the hearing.

1994), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). Issuing a preliminary injunction is an " 'extraordinary remedy' and should be restricted to 'limited circumstances.' " *Moscony v. Quaker Farms, LP,* C.A. No. 00–2285, 2000 WL 1801853, at *1 (E.D.Pa. Dec.8, 2000) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989)). A district court should endeavor to balance these four factors to determine whether an injunction should issue. *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir.2000). All four factors must weigh in favor of granting the preliminary injunction. *See Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 803 (3d Cir.1998). The moving party clearly bears the burden to prove that all elements required for a preliminary injunction are met. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 486 (3d Cir.2000).

The Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this is a dispute involving a labor organization according to 29 U.S.C. § 185(c). Venue is appropriate under 29 U.S.C. § 185(a) and 29 U.S.C. § 412 because duly authorized officers or agents of the subject labor organization are engaged in representing or acting for employee members within this District, and the alleged violation is occurring in this District.

### III. *Summary of Issues*

#### A. *Plaintiffs' Arguments*

Plaintiffs argue that President Hall's interpretation of the TWU Constitution is "patently unreasonable" and not worthy of the deference courts normally afford an official interpretation of a union constitution. (Pl.'s Mem. Supp. Mot. 6–7). They assert that his enumeration of presidential powers as "inextricably bound up" with a general grant of responsibility directly contradicts the language of Article XVI § 1, which, in describing the duties of the Local President, provides that "except as to powers and duties specifically conferred on him/her by the Constitution, he/she shall adhere to all decisions and directions of, and be subject to, the Local Executive Board." *Id.* at 7. Plaintiffs assert that the Local President is subordinate to and must follow the directions and instructions of the Board. *Id.* To support this, they cite Article XII § 2 of the TWU Constitution, which provides that between meetings of the local union membership, "the Local Executive Board shall have the authority to administer the affairs of the Local Union." *Id.* They also quote from Local 234's By-laws that "all decisions and rules shall be made by the Executive Board." *Id.* However, this provision comes under Article IV, which only refers to the "Relationship Between the Executive Board and the Joint Executive Committee." (Pl.'s Ex. 2).

Plaintiffs assert that neither the TWU Constitution nor Local 234's By-laws "specifically confer" upon the Local President the power to retain legal counsel, hire and fire professional consultants, or hire and fire business agents, but that President Hall's interpretation gives the Local President this exclusive authority, an unreasonable departure from the explicit language of the TWU Constitution limiting the Local President's powers to those specifically conferred on him or her, and giving all other power to the Board (Pl.'s Mem. Supp. Mot. Id. at 9). They argue that President Hall used the "responsible for" language in Article XVI § 1 as a source of implied presidential power, but this language is specifically omitted from Local 234's By-laws, which are the same as Article XVI § 1 except for this omission. *Id.* at 9–13; Pl.'s Ex. 1, 2.

Plaintiffs refer to a decision of the TWU International Committee on Appeals

("ICA"), upholding a decision by the Executive Board of a Dallas, Texas local union removing the local president from office for subverting the Executive Board. (Pl.s' Mem. Supp. Mot. 14). They claim this decision is directly at odds with President Hall's interpretation. *Id.;* Pl.'s Ex. 7.

### B. *Defendants' Arguments*

Defendants principally rely on the well-established judicial reticence to enter into labor union internal disputes. They also rely on the language of Article XVI § 1, which states that the "Local President shall be responsible for the proper conduct of the affairs of the Local Union." (Def.'s Mem. Opp. Mot. 6). They point out that there is no constitutional provision expressly giving either the Local President or the Board the power to retain counsel, hire accountants, or employ staff. *Id.* However, they acknowledge, except as to powers specifically conferred on the President by the TWU Constitution, the Local President must adhere to the decisions and directions of the Board. *Id.*

Defendants contend that Local 234 Presidents historically have exercised the power to originate employment decisions. *Id.* at 7–8. They assert that the silence of past Boards in response to past Presidents appointing or firing business agents indicates a tacit acknowledgment that "the power to initiate staffing decisions resides with the Local President." *Id.* at 8. They further claim that Plaintiffs have offered no evidence that past Boards have ever exercised the unreviewable power to hire counsel, accountants, and staff with no role for the Local President to initiate those decisions. *Id.* at 8–9.

Defendants claim that Plaintiffs are mischaracterizing President Hall's interpretation as granting the Local President unfettered authority to make staffing decisions when in fact the interpretation envisions a power-sharing arrangement between the Local President and the Board. *Id.* at 12–13.

Defendants assert that Plaintiff's reliance on Article V of Local 234's By-laws, which states that the Local President has no responsibility for the affairs of the union, is unavailing because the TWU Constitution mandates that a local's by-laws "shall conform to the provisions and principles of the Constitution." *Id.* at 15.

Defendants further argue that TWU's interpretation is not at odds with a prior decision by the ICA, which upheld the removal of a Local President in Dallas for failing to comply with Executive Board directives. *Id.* at 16. They claim that case involved many Board directives not related to the powers at issue in this case. *Id.* at 17.

Finally, Defendants rebuff the suggestion that TWU is "trying to micro-manage the affairs of Local 234." *Id.*

### IV. *Legal Standard for Courts Deciding Union Disputes*

"[C]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable." *Local 334 v. United Ass'n of Journeymen,* 669 F.2d 129, 131 (3d Cir. 1982) (quoting *Stelling v. Int'l Broth. of Elec. Workers,* 587 F.2d 1379, 1388 (9th Cir.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2890, 61 L.Ed.2d 315 (1979)). A plaintiff bringing a § 301 LMRA claim bears the burden of demonstrating to the Court that the union's interpretation of its own governing documents was "patently unreasonable." *Philadelphia Musical Society, Local 77 v. American Federation of Musicians,* 812 F.Supp. 509, 515 (E.D.Pa. 1992) (citing *Local 334,* 669 F.2d at 131

("sole issue" before the district court was whether the [union's] interpretation was "'patently unreasonable'")). In determining whether the interpretation was patently unreasonable, the Court should inquire "whether there was arguable authority for the officer's act from the officer's viewpoint at the time." *Id.* at 515 (quoting *Local 334,* 669 F.2d at 131 n. 4). Absent such a showing, the Court should be reluctant to overturn the union's interpretation. *Id.* Additionally, a union's interpretation of its own governing documents is due a degree of deference if that interpretation is consistent with past practice. *See Loretangeli v. Critelli,* 853 F.2d 186, 195 (3d Cir.1988).

The parties' briefs are in general agreement that a federal court, having jurisdiction to decide disputes arising out of union elections, should generally defer to the union's own interpretation of its constitution, and that a court should not overturn the union's interpretation unless it is "patently unreasonable." As we are dealing with a Motion for Preliminary Injunction, the legal issue may be framed as requiring the Court to decide whether the Plaintiffs have a reasonable likelihood of success on the merits, and need not reflect the Court's final decision on this issue.

### A. Origin of Third Circuit's Patently Unreasonable Standard Regarding Union's Interpretation of its Constitution

The Third Circuit first used the term "patently unreasonable" with regard to a union's interpretation of its governing constitution in *Local 334 v. United Ass'n of Journeymen,* 669 F.2d 129 (3d Cir.1982). In that case, the plaintiff, a local union of plumbers and pipefitters, contended that the defendant, its "parent" international union, had no authority under the union's constitution to order the consolidation of

the local's members into new "straight line" locals—one consisting entirely of plumbers and the other solely of pipefitters. *Id.* at 130. The plaintiffs and defendants pointed to different provisions of the union's constitution, and the Court cited a third provision, specifically referring to "straight-line" local unions. *Id.* at 132. In reaching its conclusion that the union's interpretation of its constitution was not patently unreasonable, the Court noted the oft-cited principle that "[c]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable." *Id.* at 131 (quoting *Stelling,* 587 F.2d at 1388).

In *Stelling,* the Ninth Circuit found that the international union's interpretation allowing it to enter a collective bargaining agreement without submitting to a vote of the union membership was not a patently unreasonable interpretation of the union's constitution. 442 F.2d at 1389. In a footnote immediately following its use of "patently unreasonable," the Court explained the phrase by noting that the "proper inquiry has been described as 'whether there was arguable authority for the officer's act from the officer's viewpoint at the time, not from a court's more sophisticated hindsight.'" *Id.* at 1391 n. 10 (quoting D. Leslie, *Federal Courts and Union Fiduciaries,* 76 COLUM. L. REV. 1314, 1319 (1976)). This test has been further defined in *Local No. 48 v. United Broth. of Carpenters and Joiners of America,* 920 F.2d 1047, 1052 (1st Cir.1990):

[W]hatever the specific formulation of the test, the circuits are in agreement that the proper focus of judicial inquiry is on the reasonableness of the union's interpretation of its constitution at the time of the decision, not on a *post hoc* evaluation of the reasonableness of the underlying action. In other words, the

critical question, uniformly, is whether the stated reason for the action was facially sufficient under the instrument of governance, or put another way, "whether there was arguable authority for the officer's act from the officer's viewpoint at the time . . . ." [quoting *Stelling*, 587 F.2d at 1389 n. 10] If this query is answered in the affirmative, further judicial scrutiny of the decision, absent bad faith, is foreclosed.

■ In summary, while a court should afford deference to a union's interpretation of its constitution, such deference yields to a determination that an interpretation is patently unreasonable if a court finds no arguable authority in the constitution itself to substantiate that interpretation. However, if a court finds any arguable authority for that interpretation, it cannot be patently unreasonable, and the court will defer to that interpretation.

### B. *Cases from the Third Circuit*

The parties agree that *Loretangeli v. Critelli*, 853 F.2d 186 (3d Cir.1988) is the Third Circuit's latest opinion on the subject matter of this dispute. In *Loretangeli*, the plaintiffs, members of Local 194 of the New Jersey Turnpike Employees' Union, sought to challenge the payment of rebates of per capita dues to two other local unions made by the parent organization, the International Federation of Professional and Technical Engineers. 853 F.2d at 187. The plaintiffs asserted that the defendants' making rebates violated the union's constitution. *Id.* The district court dismissed the plaintiffs' complaint and denied their motion for a preliminary injunction, finding that the Federation's interpretation was not "patently unreasonable" and that the plaintiffs had no reasonable possibility of success on the merits. *Id.* at 194.

The Third Circuit reversed the district court's dismissal of the complaint and remanded the case for further consideration of the plaintiffs' application for a preliminary injunction. *Id.* at 187. At issue were two constitutional provisions, one granting the international "power to authorize such expenditures as in its judgment are necessary to carry out and fulfill the purposes and objectives of the Federation" and the other providing that the "President and the Executive Council are denied any and all authority to grant special financial assistance in the form of rebates, refunds, etc., to any local union which special concession is not at the same time uniformly accorded all of the other local unions." *Id.* at 188, 193. The Court found the language of the latter provision plainly prohibited the Federation's granting of rebates and based its decision regarding the preliminary injunction on the following:

> The plaintiffs do not challenge the grant of special local assistance based upon variable local factors. They make no suggestion that the Federation match grants given to other locals. They seek only the termination of special local assistance granted *in the form of rebates*, a form of payment that they contend patently violates Article XVIII of the Federation constitution. The district court therefore misconstrued the plaintiffs' proffered interpretation.

> Second, we believe that it was an error of law to defer to the Federation's interpretation of its constitution. Such deference was inappropriate here, where the Federation's interpretation conflicted with the stark and unambiguous language of the constitution.

*Id.* at 194 (emphasis in original). The Court found it "likely that the Federation's interpretation will be found 'patently unreasonable' because it reads out of the

constitution an important protective provision." *Id.* at 195.

Another case in which a court overcame its reluctance to interfere in internal union affairs because of the union's patently unreasonable interpretation of its constitution is *Papianni v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local 11*, 622 F.Supp. 1559 (D.N.J.1985). In *Papianni*, the court had to determine:

whether the deference due to local unions in their internal affairs prevents the court from granting relief to transfer applicants who have been forced to occupy a second class status within the local union because of practices by local officials which have no basis in the union's constitution. The court concludes that the principle of deference does not extend to that extreme.

*Id.* at 1563. The plaintiffs in this case were members of a local affiliate of the International Association of Bridge, Structural and Ornamental Iron Workers, and pursuant to the union's constitution, each plaintiff applied to transfer to the defendant union, Local 11. *Id.* The plain language of the union's constitution provided that when a member wishing to transfer from one local to another properly obtained and presented a "clearance card" to the local in which he wished to transfer, "the matter shall be referred to the Executive Committee of the local union which shall accept or reject such clearance card within the discretion of the Executive Committee." *Id.* However, rather than accepting or rejecting the applications outright, the Local 11 executive committee informed each plaintiff that he had been approved but must be placed on an "approved transfer list." *Id.* Two of the plaintiffs waited five years to be admitted into the union, two plaintiffs had been waiting two years, and the named plaintiff five years, when the action was brought. *Id.*

The defendant did not contend that its waiting list procedure was literally provided for in the union's constitution. *Id.* at 1567. Rather, it asserted that the waiting list procedure was not a patently unreasonable interpretation of its constitution because the local had to comply with a 1972 consent decree, arising out of a Title VII discrimination suit, that required its local to achieve twenty percent minority membership, "which goal would be defeated if the local 'diluted' its memberships with whites like the plaintiffs." *Id.* at 1565. The local also claimed that because it operated an exclusive hiring hall in its jurisdiction that it could limit its members to "some rational relationship to the number of jobs available." *Id.* at 1569.

The court determined that "the two reasons offered by the defendant for the use of the waiting list procedure are so illogical and impermissible, that the court cannot but conclude that the procedure involves a patently unreasonable interpretation of the union's constitution." *Id.* at 1567.

### C. *Cases from Other District Courts Finding Union's Interpretation of Its Constitution Patently Unreasonable*

In *Commer v. City of New York, District Council 37, Local 375*, C.A. No. 94–8462, 1999 WL 673046, at *1 (S.D.N.Y. Aug.30, 1999), the local union, a collective bargaining representative for city civil service employees, entered into a series of agreements with the city, beginning in 1993, regarding working jointly to minimize the impact of reductions in the city work force while maintaining city services. *Id.* The union's constitution provided that council delegates were required to recommend to the locals the acceptance or rejection of "agreements affecting terms and conditions of employment which are city-wide in nature" and that "[w]ithin a time

limit to be set by the delegates in council each of the affected locals shall afford their members a reasonable opportunity to vote to accept or reject such collective bargaining agreement." *Id.* at *2.

The 1993 agreement was ratified and approved by the union's members, but in 1994, the union entered into another agreement with the city which contained an appendix detailing the process by which civil employees could be redeployed, how seniority could be determined, and the applicable probation periods for redeployed employees. *Id.* This agreement was never ratified or approved by the union's members, and in 1995, the union entered into another agreement with the city, part of which provided that the parties agreed that "the redeployment of City affected employees between City agencies shall be implemented in accordance with the terms set forth in Appendix B of the Severance Agreement, dated April 24, 1994." *Id.* The 1995 agreement was ratified and approved by the union's members. *Id.* at *3.

The plaintiff, a local union member, sued the local for breaching the union's constitution since the union membership was unaware that the ratification of the 1995 agreement implemented the redeployment procedure from the 1994 agreement that was never ratified by the members, as required by the union's constitution. *Id.* The union moved for summary judgment on the issue of whether the union's constitution required ratification of the agreement. *Id.* The defendants asserted that they were not required to seek membership approval of the 1994 agreement because it merely memorialized the applicable procedures as envisioned by the 1993 agreement. *Id.* at *5.

In denying the defendants' motion for summary judgment, the court found:

Defendants' interpretation of the mandate of their own constitution is patently unreasonable on the facts in the record. Where a contract, memorandum of understanding, or other agreement affects the terms and conditions of employment which are city-wide in nature, the union constitution requires that the union delegates make and publish a recommendation to the locals in question and afford the members of the affected locals a "reasonable opportunity" to vote on the agreement. Defendants do not dispute that the contents of Appendix B in the 1994 Memorandum affect the terms and conditions of employment of the union members. Instead, Defendants offer a rationale for circumventing the mandatory provisions of the union constitution—that the prior ratification of the 1993 agreement to develop procedures conferred approval on the terms of Appendix B. The Court finds this rationale wholly unconvincing.

*Id.* at *6. Finding the defendants' decision that the 1994 Memorandum did not require ratification "contrary to the express terms of the union constitution," the court denied the defendants' motion for summary judgment. *Id.* at *7.

In *Local 450 v. Int'l Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO,* 30 F.Supp.2d 574, 576 (E.D.N.Y.1998), the defendants, the international union and its president, announced plans to study the feasibility of merging Local 450 with several other small locals, a plan which the plaintiffs, Local 450 and its members, vigorously opposed. Local 450, which once had a membership of 10,000 had dwindled to about 90 members, but remained in good financial health with approximately $400,000 in assets as well as owning two buildings. *Id.* at 576. Fearing that the merger was imminent, Local 450's officers called a meeting of the local to discuss voting upon the issue of disaffiliation. *Id.* Upon learning of

this meeting, the international suspended the local's officers and placed the local under the control of an administrator. *Id.* The local subsequently voted to disaffiliate, but the international continued its merger plans. *Id.*

The plaintiffs moved for a preliminary injunction to prevent the defendants from merging Local 450 with other locals and enforcing a trusteeship over the local. *Id.* The defendants moved to enjoin the plaintiffs from interfering with the merger of the locals or from interfering with the supervision of a supervisor appointed by the international to act as trustee over Local 450's affairs. *Id.* at 575–76.

The court referred to the union's constitutional emergency provision for imposing a trusteeship and determined that the international's interpretation violated the plain terms of the constitution, which required, in order for a trustee or administrator to be appointed by the international, that a "serious emergency exists as a result of the violation of this Constitution, or as a result of a controversy which adversely affects the welfare of its membership in a manner which threatens the subordinate body's existence[.]" *Id.* at 579. The court found that the defendants could not point to any action, including the disaffiliation, taken by the plaintiffs, which violated the constitution or adversely affected the welfare of the local's membership in a way that threatened the union's existence. *Id.* Therefore, the trusteeship imposed on the local was not in conformity with the union's constitution. *Id.* at 582.

With respect to the validity of the imposed merger on Local 450, the court pointed to the relevant constitutional provision, which provided that in order to merge two or more local unions, "the President must determine that it is necessary in the best interests of the Union, the Locals involved and the members thereof"

and the President, in consultation with the appropriate District President, finds that "one or more of the Local Unions has had, for any consecutive six month period, an active membership of less than 50 members, and that the financial stability of such Local or Locals is or may be impaired." *Id.* at 584. The court regarded as "tortured" the union's argument that the constitutional provision gave the President the authority to merge locals at his discretion. *Id.*

In granting the plaintiffs preliminary injunctive relief, the court found that the defendant international's actions were "based upon interpretations of IUE's constitution that are 'implausible' and 'patently unreasonable.' " *Id.* at 577.

In *Nichols v. Dole*, C.A. No. 89–2305, 1990 WL 272704, at *1 (D.S.C. Aug. 1, 1990), the court found that the Secretary of Labor violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* by not bringing a civil action to invalidate a union election which did not conform to the union's constitution. In *Nichols*, the plaintiff ran for manager of the Piedmont Carolinas Joint Board, a division of the Amalgamated and Textile Workers Union, AFL–CIO. *Id.* After losing the election, the plaintiff challenged the results because he contended that the winner should have been disqualified from running for office for not meeting a candidacy requirement of the union's constitution. *Id.* The relevant constitutional language provided that a person was not eligible to be a joint board officer unless "[s]uch person has been a member in good standing ... of a local union affiliated with such a joint board, for at least one (1) year." *Id.* On the date of the election, the winner was a member of a union affiliated with the national but was not a member of a union affiliated with the local. *Id.*

The plaintiff's protest to the union was rejected, and he timely filed a complaint in accordance with the Labor Management Recording and Disclosure Act, ("LMRDA"), 29 U.S.C. § 482. *Id.* After the Labor Secretary did not take action on the plaintiff's complaint within sixty days, he filed an action under the APA for judicial review of the Secretary's failure to file a complaint. *Id.* at *2. Shortly thereafter, the Secretary concluded that she failed to take action because the national union "has a long-standing past practice of allowing transferees from one joint board to run for the office of manager of another joint board unaffiliated with the transferee's local." *Id.* She further found that the union's broad interpretation of the candidate qualification provision, when read within the context of the entire constitution, supported "its conclusion that the intent of the constitution was to increase the pool of candidates thereby enfranchising as many members as possible in the election process." *Id.*

The court found "the union's interpretation patently unreasonable. The candidacy qualification is clear, straightforward and not subject to the interpretation placed on it by the union. The union's officials do not have the authority to ignore an unambiguous provision of their constitution." *Id.* at *3. Accordingly, the court found that the Secretary violated the APA in not bringing a civil action against the union pursuant to the LMRDA. *Id.* at *4.

These decisions weave a consistent thread to guide this Court's analysis of the evidence.

## V. *Relevant Provisions of the TWU Constitution*

In the instant case, because the language of the TWU Constitution is so crucial in determining whether the interpretations are patently unreasonable, it is necessary to set forth some of these provisions in full. Art. XVI § 1 has been quoted above, at pp. 3–4. The next section that is relevant is Article XIII, "Structure," which in § 2 provides as follows:

> Subject to the provisions of the International Constitution and the by-laws of the Local Union and to all delegations of authority and assignment of responsibility to the Local Officers and to the Local Executive Board as provided in the International Constitution and Local by-laws, the supreme authority in the Local Union shall be the membership of the Local Union, acting through duly called regular meetings of the Local Union or through duly called regular meetings of the respective sections or divisions of the Local meeting separately, as the Local by-laws may provide. Between such meetings, the Local Executive Board shall have the power and authority to administer the affairs of the Local Union.

(Pl.'s Ex. 1).

The Local By-laws, in § 1, also describe the duties of the President, and also detail the functions of the Local Executive Board. (Pl.'s Ex. 2). However, because the Local By-laws contain some grammatical errors, the parties agreed that the intent of the Local by-laws was to mirror Article XVI § 1 so that this section can be considered to be part of the Local By-laws as well.

## VI. *Plaintiffs Have Satisfied the Requirements for a Preliminary Injunction*

The Court, relying on the evidence introduced at the evidentiary hearing, and the cases cited above, finds that giving deference to the Defendants' interpretation would condone verbal violence against the plain meaning of the union's Constitu-

tion. Plaintiffs have met their burden for the issuance of a preliminary injunction.

### A. *Likelihood of Success on the Merits*

■ The Court interprets the TWU Constitution to find that the intent and plain meaning of the words of the Constitution are to give overriding authority and control to the Local Executive Board. The attempts of the Local President, Ms. Alexander, to thwart the authority of the Local Executive Board is not supported in the Constitution. The Local President is authorized to act similarly to most executives, that is, to carry out the decisions of a Board of Directors, or, in this case, the Local Executive Board. Ms. Alexander interpreted the Constitution to authorize her, exclusively, with the right to initiate topics on which the Board could make its decision. There is absolutely no authorization within the Constitution for this interpretation. Carried to its logical extreme, Ms. Alexander's argument would lead to a result that unless she "initiated" some action for the Board's consideration, the Board could never do anything.

Similarly, the decision of the International President, Mr. Hall, in his letter of July 26, 2002, upholding Ms. Alexander's interpretation, is equally devoid of any merit whatsoever. His interpretation, that the Constitution's language giving the Local President the responsibility for "the proper conduct of the affairs of the Local Union" is "inextricably bound up with the power to hire and fire staff professionals" and that any attempt by the Executive Board to "usurp the power in question" would violate the Constitution, (Pl.'s Ex. 5), exemplifies what the court finds to be a "patently unreasonable" interpretation. The plain language of the Constitution mandates that the Local President "*shall adhere to all decisions and directions of,*

*and be subject to, the Local Executive Board.*" (Pl.'s Ex. 1) (emphasis added). This clear, unambiguous language does not in any way lend itself to President Hall's interpretation, and is plainly contrary to President Hall's interpretation. It is significant that in his letter of July 26, 2002, President Hall does not mention the above-quoted clause.

As noted above, an appeal was taken to the International Executive Council ("IEC") following President Hall's letter, and in its ruling by letter dated October 30, 2002, the IEC affirmed President Hall's decision. It is not crystal clear from the union Constitution whether this affirmation endorsed only the decision reached by President Hall, or also his explanation. In its letter of October 30, 2002, the IEC, significantly in the Court's view, backtracked on President Hall's interpretation of the Constitution, although it affirmed President Hall's decision. Thus, the articulation of reasons, in both President Hall's letter of July 26, 2002, and the IEC letter of October 30, 2002, are just that—articulations and not the actual decision. The Court interprets the sequence of events as the IEC affirming President Hall, who affirmed the power of Local President Alexander to have the rights which Local President Alexander claimed in her letter of July 25, 2002.

However, in reviewing the record, the Court believes that it is relevant to consider the various interpretations of President Hall in his letter of July 26, 2002, and the IEC in its letter of October 30, 2002, to see if they are reasonable interpretations of the Constitution, or patently unreasonable.

It is apparent from the language of Article V § 1 of the Constitution that because the IEC affirmed President Hall, it did not change the "interpretation and application" made by President Hall, and the latter "shall be deemed true and proper and shall

be given full force and effect." (Pl.'s Ex. 1).

The Court has above demonstrated how President Hall's interpretation is contrary to the plain language of the Constitution. The Court finds that the IEC's interpretation is similarly patently unreasonable.

It is apparent from the letter of the IEC dated October 30, 2002, that it, too, could not support the interpretations that had previously been made by Local President Alexander or International President Hall. Instead, the IEC adopted what might best be referred to as a "standard of reasonableness." Although such a standard may initially be appealing, it has no basis whatsoever in the Constitution. The IEC might have been attempting to play peacemaker by implicitly urging the Local President and the Local Executive Board to work together, but it abrogated its responsibility to interpret the union Constitution by reference to the terms of that Constitution. There is nothing in the Constitution that provides for any standard of reasonableness. The Constitution, plainly and succinctly, rests power in the Local Executive Board.

The concept of reasonableness is embodied in many legal standards.[4] The Court does not criticize the IEC if it was attempting to find a solution to the dispute, but cannot adopt the IEC's interpretation for two separate reasons. First, as noted above, under the final paragraph of the letter of October 30, 2002, and the terms of the union Constitution, the IEC affirmed the decision of President Hall. Thus, the prior interpretative paragraph, with its final resort to a standard of reasonableness, is what lawyers and judges commonly refer to as "dictum"—an explanation but not the holding of the case. And while reasonableness may be an appealing standard, or an appealing basis for conciliation and settlement, this is a Constitution that we are interpreting, and reasonableness is not a standard adopted by the Constitution. In short, the duly elected Board has the right, power, and duty under the union's Constitution to control the affairs of the union, even if in the eyes of some it is acting unreasonably. The Board has a duty to act constitutionally, but not a duty to act reasonably. If it acts unreasonably, it can be replaced at the next election. A standard of "reasonableness," however appealing, is not a standard that a court can easily interpret. However, "majority rules" is shorthand for what is required under the Constitution, and is a standard that deserves enforcement and can be enforced by this Court.

Second, even if there were any room for asserting that the IEC's decision of Octo-

---

4. The Court recognizes that a standard of reasonableness or rule of reason permeates many facets of the law.

> Thus not specifying, but indubitably contemplating and requiring a standard, it follows that it was intended that the standard of reason which had been applied at the common law and in this country in dealing with subjects of the character embraced by the statute was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had or had not brought about the wrong against which the statute provided.

*Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 60, 31 S.Ct. 502, 55 L.Ed. 619 (1911) [adopting the "rule of reason" under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1].

For example, the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(4) requires that union members may have to exhaust reasonable internal union hearing procedures before resorting to court action, and the Department of Labor has set standards for determining reasonableness in the context of qualifications for union office. *See* 29 C.F.R. § 452.36. *See also* RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (1965) (discussing the "reasonable man" standard).

ber 30, 2002 was entitled to deference on its interpretation, it provides absolutely no structure by which the local union can move forward. This Court can not defer to the IEC's October 30 interpretation because it gives no standards whatsoever as to how the union or its Board should apply this newly concocted "reasonableness" standard. Indeed, the operations of the local union have not improved since the October 30 letter, and union affairs are still at a standstill.

Accordingly, Plaintiffs have demonstrated the likelihood of success on the merits of their claim that the Defendants' interpretation of the Constitution is patently unreasonable.

### B. *Irreparable Harm*

In order for a preliminary injunction to be granted, plaintiffs must establish that they will suffer irreparable harm if an injunction is not issued. The "requisite is that the feared injury or harm be irreparable—not merely serious or substantial. 'The word means that which cannot be repaired, retrieved, put down again, atoned for .... the injury must be of a peculiar nature, so that compensation in money cannot atone for it....'" *A.O. Smith Corp. v. Federal Trade Comm'n,* 530 F.2d 515, 525 (3d Cir.1976) (quoting *Gause v. Perkins,* 56 N.C. 177, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857)).

Although research does not reveal a case in which a court has found irreparable harm to union members based on facts similar to the instant case, the Court finds that Plaintiffs have been irreparably harmed by the complete breakdown of the local union government and by the resulting inability of the local union to take any actions in furtherance of the welfare of its members, and that this situation will continue unless injunctive relief is granted. Irreparable injury can also be found from a diminution of the reputation of the Local and its image as an effective labor union. "Courts have found that harm to a union's reputation constitutes irreparable injury warranting a preliminary injunction." *Local 234,* 131 F.Supp.2d at 667 (citing *Int'l Broth. of Teamsters v. Local Union No. 810,* 19 F.3d 786, 794 (2d Cir.1994) ("allegations of financial malpractice and undemocratic procedures severely test the allegiance of union members"); *Int'l Broth. of Teamsters v. Local Union 705,* 827 F.Supp. 513, 516 (N.D.Ill.1993) (finding irreparable harm to union's reputation where local operates under allegations of financial wrongdoing)).

### C. *Whether the Non–Moving Party Will Suffer Irreparable Harm if the Injunction Is Issued*

The Court finds that Defendant Jean Alexander will not suffer irreparable harm. She is the duly elected President of the local union, and there is no threat to her continuing to function as the President. However, her duties as President, as set forth in the union Constitution, require her to carry out the decisions of the local Executive Board, and her doing so cannot be irreparable injury in any sense.

The Court further finds that the Transport Workers Union International will not suffer any irreparable harm. The Constitution states, in Article XII § 1, "the membership of the Transport Workers Union of America shall function through local unions." (Pl.'s Ex. 1). The decision of this Court requiring that the Local Executive Board of Local 234 have the authority to direct the affairs of the local union cannot possibly cause any irreparable harm to the International.

### D. *The Public Interest*

The Court finds that the public interest will be served by the issuance of a

preliminary injunction. There are two separate reasons why the public interest will be served. First, the public and particularly the thousands of members of the local union have an interest in the local union being able to function. The current dispute has brought the affairs of Local 234 to a halt. The members of the union are without leadership and their duly elected Local Executive Board is unable to serve their interests.

Secondly, any time there is a thwarting of a democratic institution, the public interest is harmed. Congressional policy is firm that unions must operate under principles of democracy. *See Sutton v. American Fed'n of State, County and Municipal Workers, Local 1510,* C.A. No. 96–6065, 1996 WL 653997, at *3 (E.D.Pa. Nov.6, 1996) (Shapiro, J.) (recognizing Congressional concern in "ensuring that unions are democratically governed and responsive to the will of their memberships)." (quoting *Sheet Metal Workers' Int'l Ass'n v. Lynn,* 488 U.S. 347, 352, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989)). For whatever reasons, the Defendants have refused to allow the elected majority of the Local Executive Board to meet, to take action, and to serve its members. Labor unions are founded on concepts of democracy, and when there is a block of the democratic process, the public interest is injured.[5]

### E. Bond

The Federal Rules of Civil Procedure require that a bond accompany the issuance of a preliminary injunction. Fed. R.Civ.P. 65(c). In this case, the Court finds that there will be little, if any, dam-

---

**5.** Professor Clyde Summers aptly stated the importance of the public expectation of union democracy:

> [I]n a society in which the articulate ethic of organization is democratic, we tend to expect all organizations to be democratic. We expect the government of private groups to mirror the government of public groups. We accept as faith that democracy is not merely a device for governing the state but is an ethic which should permeate all of life.... The depth of this conviction is evidenced by the seeming compulsion of practically all organizations to clothe themselves in the trappings of democratic structure. Constitutions of organizations as diverse as the American Medical Association provide for at least the form of democracy. The public expects unions to be democratic because they are organizations living within a democratic society....
>
> Unions have historically justified their existence on the grounds that through them workers achieve a greater degree of human dignity, and have traditionally insisted that they are and should be democratic....
>
> The public fears the size and nature of union power,—the power to close industries by strikes, the power to marshal political action, and the power to bind individual workers to collective contracts against their will. Although this fear is shrewdly cultivated by those who would weaken unions by creating an exaggerated picture of unions as a massive monolith of economic and political power, the fear is no less real. Out of our history we distrust power which is concentrated in the hands of the few and we consciously seek to keep that power widely distributed. There is, therefore, an undercurrent of demand that this power not be held by a few union officers but that it be shared by the membership of the union. Only such shared power is considered safe.
>
> The fourth reason the public expects unions to be democratic is that the union acts as a representative of its members. We have a basic ethical notion that those who claim to represent others should be controlled by those whom they represent. As an agent is subject to his principal, the officers of the union should be subject to their members. Cast in broader terms, this is but an application of the fundamental concept that the power to govern derives its just power from the consent of the governed. Thus, the union's power to govern must rest on the consent of the governed as expressed through the democratic process.

Clyde W. Summers, *The Public Interest in Union Democracy,* 53 Nw. U.L.Rev. 610, 611–12 (1958).

ages to the Defendants if it is subsequently determined, either on appeal or final hearing, that this preliminary injunction was improperly granted. Thus, the injunction will issue upon the posting by Plaintiffs of a bond in the amount of $1,000, essentially to cover any court costs that Defendants may incur.

## VII. *Conclusion*

For the reasons discussed above, Plaintiff's Motion for Preliminary Injunction will be granted.

An appropriate Order follows.

### *ORDER*

And now, this 19th day of December, 2002, upon consideration of Plaintiffs' Motion for Preliminary Injunction (Doc. No. 2), Defendants' opposition thereto, and an evidentiary hearing held on December 11, 2002, it is hereby

ORDERED as follows:

1. Plaintiffs' Motion is GRANTED;

2. Defendants TWU and Alexander shall be enjoined from giving force or effect to President Hall's July 26, 2002 constitutional interpretation or to the International Executive Council's October 30, 2002 constitutional interpretation of presidential powers;

3. Defendants TWU and President Alexander shall give full force and effect to the motions passed at Local 234's July 25, 2002 Executive Board meeting;

4. President Alexander shall be enjoined from filing disciplinary charges against Plaintiffs relating to the motions passed at Local 234's July 25, 2002 Executive Board meeting;

5. The Preliminary Injunction shall become effective upon Plaintiffs' posting of a bond in the amount of $1,000.